2024 IL App (2d) 240124
No. 2-24-0124
Opinion filed May 17, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 24-CF-10 |
| PATRICIO J. SALAS-PINEDA, | ) ) | Honorable Julia A. Yetter, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Hutchinson and Kennedy concurred in the judgment and opinion.

**OPINION**

¶ 1    In this interlocutory appeal, defendant, Patricio J. Salas-Pineda, appeals from the trial court's order, issued following a hearing on his continued detention, that denied his pretrial release with conditions under article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2022)), as amended by Public Act 101-652 (eff. Jan. 1, 2023), commonly known as the Pretrial Fairness Act (Act).[1] See Pub. Act 102-1104, § 70 (eff. Jan. 1, 2023) (amending

_____

[1]The Act is also known as the Safety, Accountability, Fairness and Equity-Today (SAFE-T) Act. Neither name is official, as neither appears in the Illinois Compiled Statutes or public acts.

various provisions of the Act); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (lifting stay and setting effective date as September 18, 2023). We affirm.

¶ 2                                I. BACKGROUND

¶ 3             A. Proceedings Leading to First Appeal (No. 2-24-0017)

¶ 4     On January 2, 2024, defendant was charged with aggravated criminal sexual assault, armed with a dangerous weapon other than a firearm (720 ILCS 5/11-1.30(a)(1), (d)(1) (West 2022)), a Class X felony; aggravated criminal sexual assault, acts in a manner that threatens the life of the victim (*id.* § 11-1.30(a)(3), (d)(1)), a Class X felony; two counts of aggravated domestic battery, strangle (*id.* § 12-3.3(a-5), (b)), a Class 2 felony; aggravated unlawful restraint (*id.* § 10-3.1(a), (b)), a Class 3 felony; unlawful restraint (*id.* § 10-3, (b)), a Class 4 felony; domestic battery, bodily harm (*id.* § 12-3.2(a)(1), (b)), a Class A misdemeanor; domestic battery, physical contact (*id.* § 12-3.2(a)(2), (b)), a Class A misdemeanor; and interfering with the reporting of domestic violence (*id.* § 12-3.5(a), (c)), a Class A misdemeanor.

¶ 5                                1. State's Petition

¶ 6     On the same day, the State petitioned to deny defendant pretrial release. 725 ILCS 5/110-6.1 (West 2022). It alleged that defendant was charged with aggravated criminal sexual assault, aggravated domestic battery, aggravated unlawful restraint, and domestic battery, all of which the court could use to find probable cause to detain defendant. The State also alleged that defendant should be denied pretrial release on the bases that he posed a real and present threat to the safety of any person or the community and that he had a high likelihood of willful flight to avoid prosecution. *Id.* § 110-6.1(a)(1.5), (4)-(6), (8). Finally, as additional grounds to deny defendant release, the State alleged that defendant had a prior conviction of driving under the influence (DUI)

in 2019, entered this country illegally through Texas in 2008 from Honduras, was charged with alien inadmissibility, and was issued a warrant/notice to appear, which appeared to be outstanding.

¶ 7    At the hearing on the State's petition, the State tendered the charging document, defendant's criminal history, and an extensive police synopsis. The synopsis related as follows. On Saturday, December 30, 2023, at about 6:25 a.m., several sheriff's deputies and, later, Algonquin police, responded to 445 Natoma Trail in Algonquin. En route, dispatch advised that the caller, M.M., had had a knife held to her neck and had been physically assaulted, battered, held at her residence for several hours, kicked in the head and face multiple times, choked, forced to have sex, and told multiple times that she was going to die.

¶ 8    Defendant was identified as the offender but had left M.M.'s residence in his vehicle when police arrived. Ultimately, defendant's vehicle came to rest in the front yard of 1165 Manhatas Trail in Algonquin. Defendant stated that he was at M.M.'s residence when an unknown male arrived, kicked him in the face, and told him to leave. In the process, defendant lost a tooth. When defendant was being taken into custody, he resisted arrest.

¶ 9    M.M., who was still in her residence, had visible signs of injury, including to her face/head, neck, arms, and back and noticeable redness in her eyes. M.M. stated that she and defendant had been in a relationship for about two months. The night prior, they arrived home from being out, and, at about 1 a.m., they began arguing after defendant observed what he thought was information on M.M.'s phone that showed she was cheating on him. Defendant retained control of M.M.'s phone during the argument. The verbal argument escalated to defendant throwing water bottles and alcoholic beverages at M.M. and, eventually, to him hitting her. Defendant then choked M.M. multiple times; she described the acts as occurring 50 times, between 1 a.m. and 6:25 a.m. With one hand, defendant grabbed the front of her neck and squeezed and pushed. He also did this while

pushing M.M. to the floor and onto her back. M.M. had trouble breathing. At one point, she reported, she felt that she was going to defecate. The choking incidents occurred in the family room and the floor of the guest bedroom.

¶ 10    Further, M.M. related that she attempted to run out of the residence at one point; however, defendant pursued her and tackled her in the attached garage, held a knife to her neck while she was on the garage floor with him on top of her, and told her something to the effect of not to move or he would kill her. Defendant forced her back into the residence at knife point. From this moment on, defendant put the knife to M.M.'s neck and threatened harm or death about 20 to 25 times, including using a jabbing motion where the tip of the blade made contact with M.M.'s neck.

¶ 11    At some point later, defendant told M.M. that he wanted to have sexual intercourse. did not believe she could say no, and they had sexual intercourse, which "started in the guest room and then moved into the family bedroom. The same guest bedroom where [M.M.] had been choked, pinned down, kicked in the head, and held at knifepoint."

¶ 12    At 3:01 a.m., M.M. sent a text message that stated "Help" to her sister's husband, Jack Settepani. However, he did not see the message until about 5:55 a.m., and the incident continued. M.M. reported that she had just finished having intercourse with defendant when her sister, Stephanie Settepani, and Jack arrived at the residence. Jack's arrival allowed M.M. to retrieve her phone and call 911. Jack intervened and forced defendant out of the residence.

¶ 13    Upon entering M.M.'s residence, a deputy observed a bottle of an alcoholic beverage on the dining room table, a chair turned on its side, two open and empty water bottles on the floor, dried liquid (presumably an alcoholic beverage) on the floor, and other miscellaneous items strewn throughout the residence.

¶ 14    The synopsis further related that, on December 31, 2023, defendant was interviewed (with an interpreter, since defendant is most comfortable with Spanish), at the Kane County jail. He was read his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), at about 9:30 a.m., and the interview was audio and video recorded. Defendant related that he and M.M. had been in a relationship for about three months. On December 29, 2023, they went to a bar and consumed four drinks. Afterward, at about 12:15 a.m., on December 30, 2023, they returned to M.M.'s residence. Defendant reported that he did not live with M.M. but temporarily stayed with her while he fixed her vehicle. Inside the residence, defendant and M.M. poured a drink and talked. M.M. started talking about going out to lunch with a friend, and defendant wanted to see the phone messages she was referring to. He looked at her phone messages because he feared she was cheating on him. M.M. showed him the messages, and defendant noted that the messages were further down in the message history (indicating that the conversation was older than he thought). He believed M.M. lied to him and told her that the messages would have been more recent if she had been making lunch plans with a friend. Defendant took M.M.'s phone and reviewed her messages. They began to batter each other.

¶ 15    Defendant provided the following timeline to police. Defendant was in the kitchen reviewing M.M.'s phone messages from men and was upset about her lying and cheating on him. He and M.M. moved between the kitchen and the dining room. Defendant advised that he consumed a large amount of alcohol and said that M.M. was crying and confessed to cheating on him. At one point, they both sat by a door and M.M. asked if she could get up and go to the couch. When she got up, she ran to the garage door. Defendant caught up to M.M. and grabbed her by the arm and from behind her back (in a bear hug) and forced her to go back inside the residence. Also, at one point, he grabbed M.M. by the mouth, which he demonstrated to police. Defendant denied

touching M.M. on the neck. However, later in the interview, he admitted to putting his hand around M.M.'s neck so that she would look at him.

¶ 16    Defendant further related that, during the incident, M.M. grabbed a knife, which prompted him to grab one as well. M.M. asked defendant what he was doing, and he responded that he was using the knife to cut a lime. Defendant could not find a lime, however.

¶ 17    The synopsis also related that defendant stated that he thought about his daughters during the incident and realized he did some things wrong and did not want to cause any further damage. He also believed that M.M. called her family at one point, because Jack arrived and struck defendant in the face. M.M. yelled at defendant to "get out of here," and he recalled bleeding a lot and an ambulance and police arriving.

¶ 18    Defendant stated that the last time the couple had intercourse was "Thursday night." He also reported that the incident was the couple's second altercation. The first one occurred during a Christmas party a few weeks earlier. When asked why M.M. ran away from him, defendant posited that M.M. feared getting hurt, as she experienced domestic violence in a previous relationship.

¶ 19    The police synopsis also included a summary of an interview with M.M., which was conducted on December 31, 2023, at 10:30 a.m. M.M. stated that, while at the bar on the evening before the incident, she and defendant each had two shots and three alcoholic beverages. Once at her residence, they poured an alcoholic beverage, played music, and talked about M.M.'s plans that she had made to meet a friend for dinner. Defendant did not trust her and believed she was not faithful. M.M. explained that this was a miscommunication due to a language barrier. Defendant misinterpreted what she said, and he took her phone and reviewed her browsing history. He saw that she had viewed another man's Facebook page, which upset him. Defendant returned M.M.'s phone to her but started an argument about her not changing her relationship status on Facebook

from "single" to "in a relationship." M.M. reported that she did not allow defendant to hold her phone, because he "smashed" a previous phone during a domestic incident on December 7, 2023 (the Christmas party that defendant had mentioned to police).

¶ 20    During the course of their argument about her relationship status on Facebook, defendant became enraged. M.M. moved from the dining room table to the couch, at which point defendant pinned her down with his hand around her neck and yelled obscenities. M.M. went to the kitchen and then made her way to the dining room to pour herself a drink. She and defendant sat at the dining room table, and defendant spoke about her lying to him. M.M. responded that defendant misunderstood her.

¶ 21    Over the next two hours, between 1 a.m. and 3 a.m., defendant's emotions were up and down. He called M.M. a liar and screamed at her to tell the truth one minute and then poured a drink and was emotional. At one point, defendant picked up a dining room chair and motioned as if he was going to throw it at her. However, he put down the chair, but threw bottles and objects at her throughout the two-hour time span. M.M. also stated that, on two occasions, defendant poured himself a drink but threw the contents onto her. He also grabbed her by the neck more times than she could keep track of, reporting that there were an "uncountable" number of times defendant put his hand around her neck, applying pressure and causing shortness of breath. At about 3 a.m., defendant gave her back her phone and went to the bathroom. M.M. texted Jack, saying "help." She then deleted the text and set her phone down as defendant exited the bathroom. Defendant announced that he was leaving, but remained in the residence. M.M. stated that she was tired, and defendant insisted they go downstairs to the basement (as this was their normal routine). However, M.M. insisted they stay upstairs and sleep in the guest bedroom (because there was a firearm in the basement bedroom). She feared defendant would use the firearm against her.

Defendant, angry, shoved M.M. down the basement steps. A struggle ensued on the steps, and defendant got on top of M.M., yelled at her, and placed his hand around her neck, attempting to force her into the basement. M.M. ran up the steps to the dining room table and told defendant she wanted to go to the guest bedroom. Defendant continued to scream that she was a liar and said that he hated her.

¶ 22    Once in the guest bedroom, defendant demanded that M.M. lay down. She complied. Defendant yelled at M.M., and she sat up. Defendant then attacked her and pinned her down on the bed, placing his hand around her neck. M.M. described the look on defendant's face as "pure rage." M.M. could not breathe and felt she had to fight for her life. Her mouth became dry, and she asked for water. Defendant walked her to the kitchen. This occurred several times, and each time defendant started the same argument all over again. At one point, M.M. admitted to lying in an attempt to appease him, but defendant became angrier, stating "I wanna kill you, but I won't do that for the sake of my daughter's [*sic*] and Jesus. Thank Jesus and my daughters' [*sic*]." He had M.M. repeat his words and showed her a tattoo image of Jesus on his arm.

¶ 23    Afterward, defendant asked M.M. to pour him another alcoholic beverage (vodka and cranberry juice). While in the kitchen, defendant grabbed a steak knife, and M.M. attempted to run away. She exited the residence through the garage and, once outside, screamed for help. Defendant grabbed her arm and forced her back into the garage. In the garage, with the knife in his hand, defendant got on top of M.M. and told her to "shut up." M.M. stopped screaming, as defendant held the knife up to her neck and said, "If you move, I will kill you." Defendant then stood, closed the door, and told M.M. to go back inside (while holding the knife to her body). Twice, he pressed the knife to the left side of her abdomen, causing redness. M.M. feared for her life, as defendant said on several occasions, "Shut up, or I'll kill you" and demanded she go back in the bedroom.

¶ 24    Once in the bedroom, defendant straddled over M.M., with his knees on her arms. Defendant threatened to stab her if she moved her hands. He pressed the tip of the knife into her neck, causing her pain. Defendant placed one hand around M.M.'s neck, and his other hand pressed the knife into her neck. Because she could not breathe, she fought to get defendant off her and they fell to the floor. Defendant regained control and held the knife to M.M.'s neck. M.M. fought to breathe, and defendant stated, "This is the last time you are going to see me because you are going to die tonight." He stood and instructed M.M. to stay on the floor and sit up against the wall.

¶ 25    Defendant then kicked, punched, and struck M.M. with an open hand about her body, including her head, face, stomach, arms, and legs. M.M. estimated that defendant kicked her in the head between 5 to 10 times. He also struck her forcefully in the eye. She was struck in the face about 20 times. Defendant instructed her to put down her hands or he would kill her. M.M. continued to raise her hands to protect herself, and defendant continued to hold the knife blade against the front and side of her neck.

¶ 26    There were times when defendant allowed M.M. to get up and use the bathroom, and there was a calm period when defendant cried about how hard his life was and how much he hated his mother. M.M. attempted to console him by placing her hand on him, and defendant asked her to have sexual intercourse with him. At this moment, M.M. saw her phone screen light up and realized it was Jack attempting to contact her. She tried to distract defendant, asking him, "are you going to hurt me?" He replied, "yes." He had the knife in his hand at this point. M.M. believed that, if she did not have sexual intercourse with defendant, she would be killed. Thus, she pretended that she wanted to have intercourse with defendant. Defendant set the knife on the dresser, and they got into bed. M.M. got on top of defendant in order to draw his attention away from her phone, which was lighting up due to notifications from Jack. M.M. then requested that they move to the

living room couch, as the knife was very close in the bedroom and her phone created further problems. On the couch, they had intercourse. After about 15 minutes, Jack's vehicle pulled into her driveway.

¶ 27    Moments later, Jack entered the residence and called out for M.M. M.M. exited the bedroom and ran away from defendant. Defendant ran after her, at which point Jack placed himself between M.M. and defendant and shoved defendant to the ground. Defendant fell face first and lost one tooth. Stephanie and Jack yelled at defendant to exit the residence. Defendant left in his vehicle. M.M. called 911. She went to Sherman Hospital and completed a sexual assault kit.

¶ 28                              2. Trial Court's Findings

¶ 29    The trial court granted the State's petition to deny defendant pretrial release. First, the court found that the State had not established a high likelihood of willful flight, noting that the fact that defendant has children who live in Honduras was not sufficient. Further, the court found that it was unclear if defendant had a pending case concerning his entry into this country. The court noted that defendant was convicted of DUI in 2019 and speculated that, at that time, any warrant issued in 2008 would have been addressed.

¶ 30    Next, the court determined that the State established that the proof is evident or the presumption great that defendant committed aggravated criminal sexual assault with a dangerous weapon, aggravated assault in a manner that threatened the life of the victim, aggravated domestic battery (strangulation), aggravated unlawful restraint, and domestic battery. The court also found that the State established defendant's dangerousness as to M.M. It noted that it relied on the police synopsis, including M.M.'s statements to police at the scene and during her later interview. The court determined that M.M.'s statements were corroborated by the injuries to her face, head, neck, arms, and back and the redness in her eyes. It also noted the state of the residence when police

arrived, defendant's threats to kill M.M. while committing sexual assault, and the repeated strangulations.

¶ 31    In determining that no conditions could mitigate the real and present threat defendant posed, the court noted that defendant held M.M. against her will for hours and abused her for hours. Global Positioning System (GPS) monitoring and electronic home monitoring (EHM), it found, would not prevent him from going to the residence "and having a similar occurrence." The court determined that defendant's actions were driven by jealousy, which he essentially admitted. Defendant appealed.

¶ 32                          3. This Court's Decision

¶ 33    On April 4, 2024, this court affirmed. *People v. Salas-Pineda*, 2024 IL App (2d) 240017-U. We held that the trial court did not err in relying on the police synopsis in determining that the State met its burden to show that the proof is evident or the presumption great that defendant committed the charged offenses (*id.* ¶ 39); we concluded that defendant forfeited his argument that the State failed to meet its burden to show that no condition or combination thereof could mitigate the threat to any person or the community or defendant's willful flight (*id.* ¶ 41); and we concluded that the record belied defendant's assertion that the court did not consider conditions such as EHM or GPS monitoring (*id.* ¶ 44).

¶ 34                     B. Proceedings Leading to this Appeal

¶ 35                       1. Hearing on Continued Detention

¶ 36    On February 7, 2024, the trial court held a hearing on defendant's continued detention. Defendant presented M.M., who testified that she had known defendant for about three months. On December 30, 2023, at some point in the evening or early morning hours, defendant asked her to have sexual intercourse with him and M.M. agreed. He did not have a knife in his hand, nor did

he give her the choice to either have sex with him or die. M.M. testified that she felt she could say no to having sexual intercourse with defendant. He did not threaten her to have sexual intercourse, and M.M. did not fear for her life beforehand. She had sexual intercourse with defendant, it was a choice she made, and it was not coerced; M.M. consented to have sexual intercourse with him.

¶ 37    M.M. further testified that, if defendant were released from custody, she would not fear for her safety because defendant is not a violent or confrontational person. "It was just an alcohol-fueled fight that just really got out of hand *** he wasn't normally like that. I think he would be able—if we got in a fight, he would walk away." When asked if it would affect her fear of defendant if the court released him with the condition that he refrain from drinking alcohol, M.M. replied, "I don't fear him, but I do think—I mean, maybe it would benefit him."

¶ 38    On cross-examination, M.M. was asked if, during their relationship, she had previously drunk alcohol with defendant and if "things ever escalated" due to alcohol. She responded that "[t]he only other incident was, like, he grabbed me by my face." M.M. agreed that she gave a statement to police during her interview that defendant had broken a cellphone after he accused her of flirting with a bartender. She also agreed that she told police that defendant had tried to strangle her (or put his hands around her throat) about 50 times between midnight and 5:30 a.m. on the night/morning of the incident, held a knife to her throat, and tackled her and stopped her (with a knife in his hand) when she tried to escape the home. She also agreed that she told police that, after having sex, defendant told her that he wanted to kill her. Defendant also told her that she should "thank Jesus and thank his daughter" for the fact that he was withholding from killing M.M. Defendant exposed a tattoo of Jesus and told M.M. to thank his tattoo.

¶ 39 Then, when asked, M.M. agreed that "those were not consensual acts." She did not consent to being strangled, and she sent a text message asking for help. She told police that she ignored the phone call from Jack because she knew that, if she did not answer, he would come to her residence.

¶ 40 At the time that defendant asked to have sex, the knife was in the bedroom but no longer in his hand; it was on the dresser, "separate." Before engaging in sex, M.M. asked defendant if he was going to hurt her, and he responded, "Yes." She testified that, often, when defendant did not understand or hear what M.M. said, he would just say "yes" because there is a significant language barrier. When she told police that she did not want to have sex with defendant, she meant that she was not in the mood, but she conceded that she had been beaten for five hours beforehand. She felt that having sex with defendant would comfort him.

¶ 41 M.M. identified photographs of defendant's knife, her "Help" text message to Jack, and her bruises, and she testified that the bruises were a result of what defendant did to her.

¶ 42 On redirect examination, M.M. testified that she and defendant had sexual intercourse in a room separate from where the knife was located.

¶ 43 Defense counsel argued that, if defendant were released from custody, he would reside at 1874 Mark Avenue in Elgin with a friend and his brother-in-law. Counsel noted that defendant had been employed as a carpenter in Batavia for almost five years. If released, he would return to work there. Noting that one of the bases for defendant's initial detention was two counts of aggravated criminal sexual assault based on the use of a dangerous weapon and threats used to achieve the crime, counsel pointed out that M.M. testified that the sexual act was consensual. Counsel argued that there was likely no probable cause for those counts. Further, counsel noted M.M.'s testimony that she did not fear for her safety if defendant were released. Counsel suggested

GPS, house arrest, a no-contact order, and refraining from consuming alcohol or illegal drugs as conditions of release.

¶ 44 The State proffered the photographic exhibits and the police synopsis. It argued that defendant should continue to be detained due to the injuries defendant inflicted, the fact that M.M. reached out for help, and her contemporaneous statements that she did what she had to do to survive. The State further argued that M.M. did not consent to have sexual intercourse with defendant and that the photographic evidence supported this.

¶ 45                                    2. Trial Court's Findings

¶ 46 The trial court denied defendant's motion to reconsider his detention and found that no other less restrictive conditions would ensure the safety of M.M. and the community. The court noted that it considered the extensive injuries to M.M. depicted in the State's exhibits. It also noted M.M.'s testimony and the statements attributed to her in the police synopsis that defendant refused to let her leave the residence for a period of hours and, during that time, threatened her with a knife and held it to her throat, resulting in injury to her throat. "[T]his is a significant amount of violence that was ongoing for a period of time." The court also noted that it was concerned for M.M.'s safety if defendant were released. The court found that GPS monitoring or EHM would not sufficiently restrict defendant's movement to provide safety to M.M. No other less restrictive conditions were sufficient to address the safety concerns.

¶ 47 On February 8, 2024, defendant filed a form notice of appeal. The Office of the State Appellate Defender was appointed to represent defendant and determined that a memorandum under Illinois Supreme Court Rule 604(h)(7) (eff. Apr. 15, 2024) (providing that the appellant "may file, but is not required to file, a memorandum") was not necessary. The State, on April 23, 2024, filed a response in opposition to defendant's appeal.

¶ 48                                    II. ANALYSIS

¶ 49    Defendant argues that the trial court erred in ordering his continued detention. For the following reasons, we disagree.

¶ 50    The Act amended the Code by abolishing traditional monetary bail in favor of pretrial release on personal recognizance or with conditions of release. 725 ILCS 5/110-1.5, 110-2(a) (West 2022). For qualifying offenses, upon filing a verified petition requesting denial of pretrial release, the State has the burden to prove by clear and convincing evidence that (1) the proof is evident or the presumption great that the defendant has committed a qualifying offense (*id.* § 110-6.1(e)(1)), (2) the defendant's pretrial release poses a real and present threat to the safety of any person or persons or the community (*id.* § 110-6.1(a)(1)-(7), (e)(2)) or a likelihood of willful flight to avoid prosecution (*id.* § 110-6.1(a)(8), (e)(3)), and (3) no condition or combination of conditions can mitigate the real and present threat to the safety of any person or the community or prevent the defendant's willful flight from prosecution (*id.* § 110-6.1(e)(3)).

¶ 51    In considering whether the defendant poses a real and present threat to the safety of any person or the community, *i.e.*, making a determination of "dangerousness," the trial court may consider evidence concerning factors that include, but are not limited to, (1) the nature and circumstances of any offense charged, including whether the offense is a crime of violence involving a weapon or a sex offense; (2) the history and characteristics of the defendant; (3) the identity of any person to whom the defendant is believed to pose a threat and the nature of the threat; (4) any statements made by or attributed to the defendant, together with the circumstances surrounding the statements; (5) the age and physical condition of the defendant; (6) the age and physical condition of the victim or complaining witness; (7) whether the defendant is known to possess or have access to a weapon; (8) whether, at the time of the current offense or any other

offense, the defendant was on probation, parole, or supervised release from custody; and (9) any other factors including those listed in section 110-5 of the Code (*id.* § 110-5). *Id.* § 110-6.1(g).

¶ 52    To set appropriate conditions of pretrial release, the trial court must determine, by clear and convincing evidence, what pretrial release conditions, "if any, will reasonably ensure the appearance of a defendant as required or the safety of any other person or the community and the likelihood of compliance by the defendant with all the conditions of pretrial release." *Id.* § 110-5(a). In reaching its determination, the trial court must consider (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; (4) the nature and seriousness of the specific, real, and present threat to any person that would be posed by the person's release; and (5) the nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process. *Id.* § 110-5(a)(1)-(5). The statute lists no singular factor as dispositive. See *id.* In addition, when a defendant is charged with domestic battery or unlawful restraint, the trial court can consider additional factors, such as whether the alleged incident involved harassment or abuse as defined in the domestic violence statute; whether the defendant has a history of domestic violence or a history of other criminal acts; whether the defendant has been or is potentially a threat to any other person; the severity of the alleged incident; whether a separation from the victim of abuse or a termination of the relationship between them has recently occurred or is pending; whether the defendant has exhibited obsessive or controlling behaviors toward the victim; and any other factors the court deems have a reasonable bearing upon the defendant's propensity or reputation for violent, abusive, or assaultive behavior, or lack of that behavior. *Id.* § 110-5(a)(6)(A)-(B), (E), (H)-(J), (L).

¶ 53    Following the initial pretrial detention hearing, the court has a continuing obligation under the statute to assess whether *continued* detention is necessary at subsequent appearances.

Specifically, the statute provides that, at each subsequent appearance, the court must find "that continued detention is necessary to avoid a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case, or to prevent the defendant's willful flight from prosecution." *Id.* § 110-6.1(i-5); *People v. Long*, 2023 IL App (5th) 230881, ¶ 15; *People v. Stokes*, 2024 IL App (1st) 232022-U, ¶ 36. "Notably, this portion of the Code, unlike the portions dealing with petitions for detention, does not prescribe a quantum of evidence or place a burden of proof on any party." *People v. Mansoori*, 2024 IL App (1st) 232351, ¶ 18. The abuse-of-discretion standard applies to a review of the trial court's order of continued detention under section 110-6.1(i-5) of the Code. *Long*, 2023 IL App (5th) 230881, ¶ 16.

¶ 54 Addressing dangerousness, defendant asserts that M.M. testified of her own volition that she consented to the sexual act alleged to constitute the aggravated criminal sexual assault and testified that she did not fear for her safety if defendant were released from custody. Addressing less restrictive conditions, defendant argues that M.M. testified that she did not fear for her safety if defendant were released from custody. Finally, defendant argues that the trial court erred in focusing on concerns for M.M.'s safety, where she testified that she did not fear for her safety if defendant were released from custody.

¶ 55 The State responds that the trial court explicitly considered M.M.'s testimony that she would not fear for her safety if defendant were released and that the sexual intercourse was consensual. However, it also considered the other evidence, including that M.M. acknowledged that she told police that defendant strangled her about 50 times, he held a knife to her throat, she tried to escape, and defendant tackled her to stop her from leaving and had a knife in his hand at the time. M.M. also acknowledged that defendant told her he wanted to kill her and that she did not consent to being strangled. She also sent a text message to Jack during the incident, stating

"help," indicating fear of defendant. The trial court, the State further notes, considered the photographs showing injuries to M.M., which she acknowledged were caused by defendant. It also considered that there were numerous domestic battery charges and that defendant held M.M. against her will for a period of hours and held a knife to her throat to prevent her from leaving. Finally, the State notes that the court found that GPS monitoring and EHM were not sufficient to provide for M.M.'s safety and that no conditions less restrictive than pretrial detention were sufficient to address those concerns.

¶ 56    We conclude that the trial court did not abuse its discretion in finding that the evidence supported a determination that defendant's continued detention was necessary to avoid any threat he posed. Although M.M.'s testimony at the continued detention hearing painted the hours-long incident as less violent than the police synopsis and her initial statements and interview had portrayed, the court's assessment of all of the evidence was reasonable. At the continued detention hearing, the court reviewed the police synopsis and the State's exhibits, the latter of which M.M. conceded portrayed injuries she sustained as a result of defendant's actions. She testified that she reported to police that defendant tried to strangle her about 50 times, held a knife to her throat, and tackled her to stop her from trying to escape. M.M. also testified that she did not consent to being strangled and that she texted Jack for help. In her police interview soon after the incident, M.M. stated that defendant threw objects at her, screamed at her, grabbed her by the neck (causing shortness of breath) and kicked, punched, and struck her.

¶ 57    The trial court was not required to credit, to the exclusion of other evidence, M.M.'s February 7, 2024, testimony that she consented to sexual intercourse with defendant or that she did not fear for her safety if he were released. She conceded on February 7, 2024, that she had been beaten for five hours before they had intercourse, and her statements and interview relayed

in the police synopsis reflected a lack of consent and fear for her life, both generally and especially if she did not have sexual intercourse with defendant.

¶ 58    In light of all the evidence, the trial court did not err in determining that GPS monitoring and EHM would not sufficiently restrict defendant's movement or that no other less restrictive conditions would sufficiently address safety concerns.

¶ 59                                      III. CONCLUSION

¶ 60    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 61    Affirmed.

*People v. Salas-Pineda*, 2024 IL App (2d) 240124

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 24-CF-10; the Hon. Julia A. Yetter, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd and Carolyn R. Klarquist, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Patrick Delfino and David J. Robinson, of State's Attorneys Appellate Prosecutor's Office, of Springfield, for the People. |