2024 IL App (1st) 221595

No. 1-22-1595

Opinion filed August 14, 2024

Third Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 326 |
| | ) | |
| JOSHUA KLINE, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAN TINE delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice D.B. Walker concurred in the judgment and opinion.
Presiding Justice Reyes also specially concurred, with opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Joshua Kline was found guilty of aggravated criminal sexual assault, aggravated kidnapping, and aggravated battery and was sentenced to 85 years in prison. On appeal, defendant argues that (1) the trial court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during jury selection, (2) he did not receive a fair trial due to the trial court's comments throughout the proceedings, (3) the evidence was insufficient to prove him guilty, (4) trial counsel rendered ineffective assistance, (5) the trial court's errors, taken together, constituted cumulative error, and (6) his sentence is excessive. For the following reasons, we

affirm and correct the mittimus to reflect that defendant was convicted of aggravated battery, not aggravated criminal sexual abuse.

¶ 2                                      I. BACKGROUND

¶ 3      The State proceeded to trial on three counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(2) (West 2018)), one count of aggravated kidnapping (*id.* § 10-2(a)(3)), and one count of aggravated battery (*id.* § 12-3.05(a)(5)). The charges arose out of defendant's violent sexual assault of J.S. on August 1, 2018.[1]

¶ 4                                    A. Pretrial Motions

¶ 5                              1. Motion to Suppress Statement

¶ 6      Prior to trial, defendant filed a motion to suppress a statement he made to police and prosecutors following his arrest. Defendant alleged that Chicago police officers arrested him without a warrant on November 28, 2018, and interrogated him despite inadequate *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and despite defendant invoking his right to counsel and his right to remain silent. During a pretrial hearing on that motion, trial counsel stated that he was not contesting probable cause to arrest defendant but argued that defendant's arrest, pursuant to an investigative alert and at gunpoint, was part of the coercive circumstances that led to the statement at issue. The trial court responded that "[a]n investigative alert means absolutely nothing whatsoever—about the arrest of [defendant]" and stated that police had probable cause to arrest defendant based on J.S.'s identification of him. The State represented that

---

[1]J.S. is an adult, but we use her initials to protect her privacy because she is a victim of sexual assault. See *People v. Munoz-Salgado*, 2016 IL App (2d) 140325, ¶ 1 n.1.

it would not use defendant's statement in its case in chief, and the trial court ruled that the State could use that statement for impeachment or rebuttal.

¶ 7                                    2. Motions *in Limine*

¶ 8      Also prior to trial, the State filed two motions *in limine* relevant to this appeal. First, the State moved to exclude evidence that J.S. was a sex worker before, during, or after this incident, including evidence of an online post for her services. The State filed this motion pursuant to section 115-7 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7 (West 2018)), which is known as the "rape shield statute." Defendant acknowledged that J.S.'s prior and subsequent sexual history were not admissible but argued that he should be allowed to introduce the fact that, in this incident, he contacted J.S. through an online advertisement and agreed to pay her for sex. The court admitted evidence that defendant paid J.S. for sex on August 1, 2018, but otherwise granted the State's motion and barred reference to her as a sex worker.

¶ 9      The State also moved *in limine* to admit evidence of an April 2018 incident involving defendant's former girlfriend, R.B. In that incident, defendant invited R.B. to spend the night at his apartment, and she agreed. When R.B. and defendant were sleeping together, he placed her in a choke hold from behind until she lost consciousness. When R.B. awoke, defendant forcibly inserted his penis into her vagina without a condom. R.B. attempted to escape but defendant restrained her by her neck. Defendant eventually allowed R.B. to leave, and she reported this incident to police. The State argued that the court should admit evidence of defendant's assault of R.B. because it occurred four months before defendant's assault of J.S., the facts of the two incidents were virtually identical, and it would rebut any suggestion that defendant's assault of J.S.

was an isolated incident or consensual. The State's motion to admit this evidence cited section 115-7.3 of the Code (*id.* § 115-7.3) and *People v. Donoho*, 204 Ill. 2d 159 (2003).

¶ 10 Defendant acknowledged that the two incidents occurred close in time but argued that they were not factually similar. Defendant contended that he had a "shaky, but consensual, long-term relationship" with R.B. and that the April 2018 assault was more akin to "a domestic violence incident." Defendant also argued that evidence of his assault of R.B. offered nothing probative as to his *modus operandi*, design, plan, intent, motive, or lack of mistake because many sexual assaults involve the offender choking the victim and not using a condom. The trial court admitted evidence of defendant's assault of R.B. Applying the section 115-7.3 factors, the court found that defendant's assaults of R.B. and J.S. were sufficiently close in time and factually similar and that this evidence was more probative than prejudicial to show that J.S. did not consent during the August 2018 incident.

¶ 11                                    B. Trial

¶ 12 During jury selection, the trial court explained to prospective jurors that it would instruct them on four principles of law and then ask "if anybody as a possible juror understands and accepts that instruction." The court instructed the prospective jurors as follows:

> "The first legal instruction or principle is the following. Under the law, Mr. Kline is innocent of the charge against him throughout every stage of the trial and not until you find beyond a reasonable doubt defendant is guilty. Defendant's innocence [*sic*] has to be proven guilty beyond a reasonable doubt.
>
> Anybody in the box or audience not understand that instruction, presumption of innocence, beyond a reasonable doubt? No hands. No response.

The next principle, like I say, they go hand in hand together. The State through the assistant attorney [*sic*], Ms. Planey, Ms. Leafblad, have the burden of [proving defendant] guilty beyond a reasonable doubt. That burden remains with them throughout the entire trial. Burden is proof beyond a reasonable doubt and they have that burden throughout the entire trial.

As a juror, if do you not [*sic*] understand that instruction, if so, raise your hand now. Again, no hands. No response.

Third principle, third legal instruction, defendant Mr. Joshua Kline must rely on his innocence and does not have to prove his innocence. He has his innocence and does not have to prove his innocence. Anybody not understand that instruction, raise your hand now. Again, no hands. No response.

Fourth one I will talk about now is part of the other three obviously. Defendant Joshua Kline has the right to remain silent and not testify. He has the absolute right not to testify. If he chooses not to testify, you as jurors must not let in any way [a]ffect your decision [*sic*]. Will that [a]ffect your decision your decision [*sic*], his right to remain silent and not testify? Anyone as a possible jury [*sic*] not accept or understand that instruction? If so, raise your hand now. No hands. No response."

¶ 13    Following jury selection and opening statements, J.S. testified that her phone number was listed online on August 1, 2018. At approximately 7:35 p.m., she received a text message from defendant, whom she did not know, and they discussed payment "[f]or her time." J.S. drove to an address on the 4200 block of North Monitor Avenue, where she met defendant, whom she

identified in court. J.S. also identified photographs of the apartment building at which she met defendant, and the State moved those photographs into evidence.

¶ 14    Defendant walked J.S. into a dark apartment and told her that a $300 "donation for [her] time" was on a desk. J.S. did not see the money, so she began to leave, but defendant punched her in the neck and choked her in a headlock from behind. J.S. could not breathe, and the headlock was extremely painful. She was unable to free herself, so she pretended to pass out, and defendant dropped her onto a bed. J.S. "blacked out for a bit" and awoke to defendant yelling in her face, "I'm not going to do anything, don't worry. I'm not doing anything, you're not going anywhere." She tried to mace defendant, but he "pulled [her] finger backwards like he was going to break it." Defendant then took J.S.'s phone from her hand and held her legs to prevent her from "stomp[ing] on the floor to let people hear what he was doing." Defendant again choked J.S. from behind, and she was unable to breathe. Defendant put his hand over J.S.'s mouth and held her nose shut, and she briefly lost consciousness. When J.S. came to, defendant was again "in [her] face" telling her that she could not leave. J.S. was lying on the bed and defendant was on top of her, holding her wrists down. J.S. was crying and said to defendant, "Maybe you're not like this, I'm sure there's people you care about." Defendant sat in the corner and said, "You're right, I'm not like this."

¶ 15    J.S. then removed her clothes and said defendant could do whatever he wanted so that she could leave. Defendant forced his penis into J.S.'s mouth while "[v]iolently" holding her head and neck for approximately 10 minutes. J.S. told defendant to lie next to her so he would "stop pulling [her] neck." Defendant did so, "shoved his tongue down [her] throat," which J.S. found "gross, it was disgusting." Defendant then "raped [J.S.], he put his penis in [her] vagina." J.S. asked

defendant to wear a condom but he refused. Defendant ejaculated in J.S.'s vagina and then inserted his penis into her anus and ejaculated again. Defendant also ejaculated on J.S.'s stomach.

¶ 16    Defendant told J.S. to stay and talk to him, which she did so she could eventually leave. Defendant "br[ought] up his ex-girlfriend, and he said you know, you're going to be messed up for a while. My ex-girlfriend was." J.S. began coughing and was unable to move her neck; she "almost threw up, but *** swallowed it so he wouldn't get mad." J.S.'s phone rang, and she told defendant that he had to let her leave because people were looking for her. As defendant walked J.S. out of the apartment, she "pretended like oh, well, this was fun," then ran to her car. At some point after J.S. left, defendant sent her a text message asking, "So what are you going to do now?" J.S. identified the text messages she exchanged with defendant on August 1, 2018, as well as two photographs of defendant depicting a scar on his stomach. The State moved these items into evidence.

¶ 17    After leaving defendant's apartment, J.S. sent a text message to her boyfriend, James Marcus, stating that she "just got attacked and raped." J.S. identified a copy of this text message, and the State moved it into evidence. J.S. drove to Marcus's house and then spoke to police. Police transported J.S. to St. Mary's Hospital, where she received treatment. J.S. identified photographs of herself at the hospital, which the State moved into evidence. The photographs depict an abrasion on the right side of J.S.'s face near her nose and bruising to the lower front of her neck. She testified that the abrasion on her face was caused by defendant holding her nose shut.

¶ 18    J.S. identified defendant to police in a photograph on August 19, 2018. In court, J.S. identified the photo array in which she identified defendant and an advisory form she signed, and the State moved those items into evidence.

¶ 19    James Marcus testified that he was dating J.S. in August 2018. On the night of August 1, 2018, J.S. sent Marcus a text message stating that she had been "attacked and raped." Sometime thereafter, J.S. drove to Marcus's home, and he entered her vehicle. J.S. was crying, and Marcus saw bruises on her neck. J.S. said that a man choked her, told her he was going to kill her, and sexually assaulted her without a condom. J.S. and Marcus drove to a police station, where J.S. spoke to officers. Police then transported J.S. and Marcus to St. Mary's Hospital. When J.S. was discharged from the hospital, Marcus took her to his home and attempted to care for her.

¶ 20    Chicago police officer Marisol Ruiz testified that she interviewed J.S. at a police station on August 1, 2018. J.S. did not know the name of the man who attacked her, but she provided his address. Ruiz testified that J.S. was upset and distressed during the interview. Ruiz transported J.S. and her boyfriend to St. Mary's Hospital.

¶ 21    Dr. Amy Yuksel testified that she was an emergency physician at St. Mary's Hospital. She treated J.S. on the night of August 1, 2018, and the early morning hours of August 2, 2018. J.S. stated that she was strangled during an assault. Dr. Yuksel observed a 5-millimeter abrasion on J.S.'s right cheek and a 6-millimeter abrasion on the front of her neck. Dr. Yuksel diagnosed J.S. as having been the victim of a sexual assault and an assault by manual strangulation, as well suffering a contusion of the neck and an abrasion of the face. Dr. Yuksel conducted a sexual assault kit and collected J.S.'s clothing, both of which she identified in court.

¶ 22    The parties stipulated that a Chicago police evidence technician retrieved clothing and a sexual assault kit from St. Mary's Hospital on August 2, 2018, and inventoried both items. The State moved both items into evidence.

¶ 23    Detective Thomas Conway testified that he interviewed J.S. at a police station on August 3, 2018. J.S. did not know the name of the man who assaulted her, but she provided the location at which the assault occurred. Conway and J.S. visited the scene on August 19, 2018, and J.S. identified the building in which she was assaulted. Conway learned that defendant was a tenant of the building J.S. identified and he matched the physical description J.S. provided.

¶ 24    Detective John McNichols testified that he conducted a photo array in this case on August 19, 2018. J.S. identified defendant as the person who attacked and sexually assaulted her. In court, McNichols identified the photo array and an advisory form that J.S. signed.

¶ 25    Former Cook County State's Attorney's Office investigator Joanne Ryan testified that she collected a buccal swab from defendant, whom she identified in court, on February 26, 2019, and inventoried it with the Chicago Police Department. In court, Ryan identified the buccal swab she collected, and the State moved it into evidence.

¶ 26    Nerissa Peace was qualified as an expert in forensic deoxyribonucleic acid (DNA) analysis; she performed DNA analysis on the samples in this case. Male DNA was present on J.S.'s anal, vaginal, and oral swabs, as well as the swabs of her face and neck abrasions.

¶ 27    Illinois State Police forensic scientist Elizabeth Zawicki was qualified as an expert in DNA analysis; she performed DNA analysis on the samples in this case as well. Defendant matched the male DNA profiles on J.S.'s vaginal, oral, anal, and neck abrasion swabs, but not the face abrasion swab.

¶ 28    R.B. testified that she and defendant, whom she identified in court, began living together in 2012 and had a daughter in 2013. R.B. and defendant separated in early 2018 but remained in contact. On April 16, 2018, R.B. went to defendant's apartment at his invitation and, after visiting

with their daughter, went to bed. Defendant came to bed shortly thereafter and wanted to have sex, but R.B. did not. Defendant choked R.B. from behind until she lost consciousness. When R.B. awoke, she asked to leave, and defendant refused. Defendant forcibly inserted his penis into R.B.'s vagina without a condom and ejaculated. Thereafter, R.B. tried to escape while defendant was smoking, but he grabbed her neck from behind and pulled her back into the apartment. R.B. was able to leave in the morning and experienced hoarseness and pain in the following days. In early August 2018, defendant contacted R.B. by telephone and text message and described assaulting a woman who reminded him of R.B.; defendant stated that "he did the same thing to her that he did to" R.B.

¶ 29    Defendant testified that he contacted J.S. through a website called Slixa.com on August 1, 2018. They communicated via text message, and J.S. arrived at defendant's apartment building at approximately 9 p.m. When J.S. entered the apartment, defendant paid her $350 for "rough sex." J.S. performed oral sex on defendant, and defendant then had vaginal sex with her while wearing a condom. Defendant asked if J.S. enjoyed anal sex, and she responded that she "loved it," so he attempted to have anal sex with her. She said it hurt, so he stopped without penetrating her. Defendant removed the condom and "went back up" so as "[t]o not contaminate her." Defendant ejaculated on J.S.'s chest and the exterior of her vagina. Defendant testified that he did not strangle or choke J.S. at any point, and he denied that J.S. did not consent to having sex with him.

¶ 30    Defendant and J.S. then lay next to each other and conversed about their families. While J.S. used the bathroom, defendant took the money he had given her from her purse. Defendant then walked J.S. to her car. She kissed him and said not to hesitate to call her again. Defendant returned to his apartment and, a few minutes later, heard J.S. pounding on his kitchen window. J.S.

demanded that defendant return her money; he "told her she should go before [he] call[ed] the police." J.S responded that she would go to the police and accuse defendant of sexually assaulting her. Defendant laughed at her, and she stormed off.

¶ 31    On the final day of trial, defendant did not appear, and the trial court issued a warrant for his arrest. The court instructed the jury that defendant had voluntarily chosen not to attend trial and that the jury was "not to assume in any way whatsoever on the case of [defendant] the fact that he is not here." The jury found defendant guilty on all counts.[2]

¶ 32                          C. Posttrial Motions and Sentencing

¶ 33    Defendant filed a motion for a new trial, arguing in relevant part that the State failed to prove him guilty beyond a reasonable doubt, that the court erred by granting the State's motions *in limine* to exclude evidence pursuant to the "rape shield statute" and to admit R.B.'s other-crimes testimony, and that the verdict was "the result of passion, bias, and prejudice on the part of the jury."

¶ 34    Defendant did not appear for the hearing on his motion for a new trial. The trial court denied defendant's motion for a new trial and proceeded immediately to sentencing. The presentence investigation report (PSI) indicated that defendant had been convicted of unauthorized access to or destruction of data in 2001 and was sentenced to one year in prison. Also in 2001, defendant was convicted of residential burglary and sentenced to five years in prison. In aggravation, the State presented a victim impact statement from J.S., which described the trauma and mental suffering that defendant's sexual assault of her caused. J.S. stated that she "live[d] in

_____

[2]The jury foreperson's oral reading of the verdict referenced findings of guilt on two counts of aggravated kidnapping, but the written verdict forms and the mittimus reflect a conviction for only one count of aggravated kidnapping.

fear every day that [defendant] isn't in jail." The State argued that defendant's sentences for Class X felony aggravated criminal sexual assault and aggravated kidnapping should run consecutively for a minimum sentence of 24 years in prison and a maximum sentence of 120 years. The State also highlighted that defendant had shown no remorse and had fled just before the verdict.

¶ 35   Defendant presented no evidence in mitigation but argued that the court should "take into account any rehabilitative potential he might have." Defendant agreed with the State's sentencing calculation and requested a sentence of eight years on each Class X count for a total of 32 years in prison. Defendant also argued that the aggravated battery conviction should merge into the aggravated kidnapping conviction, as the aggravated kidnapping count was premised on aggravated battery.

¶ 36   The trial court sentenced defendant to 25 years in prison on each of the three counts of aggravated criminal sexual assault and 10 years on the aggravated kidnapping count, those four sentences to run consecutively, plus 5 years concurrently on the aggravated battery count, for a total of 85 years in prison. The court described defendant's claim that J.S. consented to having sex with him as "[o]utrageous testimony" considering the photographs of her injuries. The court also noted that defendant fled on the last day of trial and was still at large and that J.S. was afraid of him.

¶ 37   Defendant was arrested on the same day he was sentenced. He then filed a motion to reconsider sentence, which is not included in the record on appeal. At a hearing on that motion, Margie Kaminski testified that defendant was a longtime friend of her son, Brandon Kitchen. Defendant was an "all-around nice guy" who helped Kitchen when he was struggling with personal issues. Kitchen himself also testified and described defendant as a good friend, honest, and

trustworthy. Kitchen testified that defendant took him to the hospital when Kitchen was suffering from alcohol withdrawal. According to Kitchen, defendant suffered from post-traumatic stress disorder and substance abuse issues that were "somewhat out of control" in August 2018.

¶ 38    In allocution, defendant apologized and stated that he had only himself to blame for this situation. Defendant argued in relevant part that the court should reconsider his sentence based on Kaminski and Kitchen's testimony.

¶ 39    The trial court denied defendant's motion to reconsider sentence, acknowledging the mitigation witnesses' testimony but focusing on the facts of the case as established at trial.

¶ 40    Defendant timely appealed.

¶ 41                                II. ANALYSIS

¶ 42    On appeal, defendant contends that (1) the trial court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during jury selection, (2) he was denied a fair trial due to the trial court judge's inappropriate comments throughout the proceedings, (3) the State failed to prove him guilty beyond a reasonable doubt, (4) trial counsel rendered ineffective assistance, (5) these four errors combined to result in cumulative error, and (6) his sentence is excessive.

¶ 43                                A. Rule 431(b)

¶ 44    Defendant first contends that the trial court violated Rule 431(b), which codifies our supreme court's decision in *People v. Zehr*, 103 Ill. 2d 472 (1984). *People v. Birge*, 2021 IL 125644, ¶ 28. Rule 431(b) requires the trial court to ask prospective jurors whether they understand and accept four constitutional principles: (1) the defendant is presumed innocent, (2) the State must prove the defendant guilty beyond a reasonable doubt, (3) the defendant is not required to offer any evidence, and (4) if the defendant does not testify it cannot be held against him. Ill. S. Ct. R.

431(b) (eff. July 1, 2012). Rule 431(b) imposes "an affirmative *sua sponte* duty on the trial courts to ask potential jurors in each and every case whether they understand and accept the *Zehr* principles" and requires the trial court to give each prospective juror an opportunity to respond. (Internal quotation marks omitted.) *People v. Magallanes*, 409 Ill. App. 3d 720, 729-30 (2011). We review the trial court's compliance with Rule 431(b) *de novo*. *People v. Belknap*, 2014 IL 117094, ¶ 41.

¶ 45    The State concedes, and we agree, that the trial court violated Rule 431(b). For three of the four Rule 431(b) principles, the court asked only whether the prospective jurors understood that principle, not whether they accepted it. That phrasing does not comply with Rule 431(b). See *People v. Thompson*, 238 Ill. 2d 598, 607 (2010).

¶ 46    However, defendant forfeited this issue because he did not object to the court's Rule 431(b) questioning and did not raise this issue in his posttrial motion. See *id.* at 611-12. Nevertheless, defendant seeks plain error review. The plain error doctrine allows us to review a forfeited claim of error when either (1) the evidence is closely balanced, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). "A Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury." *People v. Sebby*, 2017 IL 119445, ¶ 52. There is no such evidence in this case, and defendant does not seek second-prong plain error review. Therefore, defendant is limited to seeking first-prong plain error review, under which he must demonstrate that the evidence was closely balanced. See *id.* ¶ 72.

¶ 47    We find that the evidence was not closely balanced. There is no dispute that defendant and J.S. had a sexual encounter on the night of August 1, 2018. According to defendant, that encounter

was consensual, and he practiced at least some form of safer sex. According to J.S., the encounter was nonconsensual and violent, and defendant refused to use a condom. The evidence overwhelmingly supported J.S.'s account. Post-occurrence witness James Marcus corroborated J.S.'s testimony. J.S. immediately reported defendant's assault to police and identified the apartment building where it occurred. Dr. Yuksel diagnosed J.S. as having been the victim of a sexual and physical assault involving strangulation. Photographs of J.S.'s face and neck injuries corroborated her testimony that defendant choked her and covered her mouth and nose with his hand. J.S. identified defendant to police in a photo array 18 days after the sexual assault. DNA evidence corroborated J.S.'s testimony that defendant penetrated her orally, anally, and vaginally without a condom and that he caused her neck injuries. R.B. described a remarkably similar sexual assault defendant committed just four months prior to assaulting J.S. By contrast, defendant's version of events stood alone with no corroborating witnesses, unsupported by forensic evidence.

¶ 48    Defendant's only argument that the evidence was closely balanced merely incorporates his argument that the evidence was insufficient to prove him guilty. We reject that argument for the reasons explained below. Accordingly, we do not find first-prong plain error with respect to the trial court's Rule 431(b) questioning, defendant's forfeiture of this issue stands, and we affirm his convictions over his claim of Rule 431(b) noncompliance.

¶ 49                    B. Trial Court Judge's Comments

¶ 50    Defendant next argues that he was deprived of a fair trial based on comments the trial court judge made throughout the proceedings. A judge should be " 'patient, dignified, and courteous to litigants, jurors and witnesses, lawyers and others with whom he deals in his official capacity.' " *People v. Fisher*, 2023 IL App (4th) 220717, ¶ 40 (quoting *People v. Eckert*, 194 Ill. App. 3d 667,

674 (1990)); see *People v. Moore*, 2023 IL App (1st) 211421, ¶ 131. For a trial court judge's comments to constitute reversible error, the defendant must show that the comments were improper and that he was prejudiced by those comments. *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 76. "A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice." *People v. Faria*, 402 Ill. App. 3d 475, 482 (2010) (citing *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002)).

¶ 51 We acknowledge that the comments defendant takes issue with are inappropriate. During a pretrial hearing, the judge said unprompted and completely out of any context, "There is an old adage about sexually assaulting. You can even rape a prostitute," in reference to J.S. We do not speculate as to what "old adage" the judge was referencing, but the inference that it is surprising that sex workers can be victims of sexual assault is callous and outdated.

¶ 52 Relatedly, the trial court judge repeatedly referenced J.S. as a "working girl." The less stigmatizing term is sex worker. See *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 9. Additionally, the trial court judge's repeated references to J.S. as "the girl" were inappropriate. J.S. is an adult woman with a name. Referring to her by her initials or her first name rather than infantilizing her could have better maintained the dignity of the proceedings.

¶ 53 In addition, when a prospective juror originally from Guatemala expressed difficulty understanding the judge, he responded, "You don't understand English after 20 years here? Never mind. Thank you," and immediately stopped questioning the prospective juror. Sarcastic commentary about an immigrant's ability to speak English is improper. See *People v. Muoi Phuong*, 287 Ill. App. 3d 988, 994 (1997). When the State's proposed jury instructions contained a typographical error, the judge said, "From now on when the instructions are done, have someone

do it besides Stevie Wonder, would you, please?," referencing the blind musician. Discussing the deadline for jury instructions, the judge told the State to "tell [Cook County State's Attorney Kim] Foxx to work a bit later, if she works at all." The offensive nature of these comments requires no explanation, and we reject the State's attempt to minimize these comments as "wholly innocuous."

¶ 54    Defendant notes that improper commentary is a recurring problem with this trial court judge. In *People v. Jones*, 2016 IL App (1st) 141008, ¶¶ 37-38, this court reversed the defendant's convictions based in part on the judge's comments belittling the defendant for apologizing to his children at sentencing. We found that the judge's "sarcastic and biased comments reflected neither dignity nor courtesy." *Id.* ¶ 38. His behavior in this case is similar, even though all the factors that supported reversal in *Jones* are not present in the case at bar.

¶ 55    We decline to reverse on this basis for several reasons. First, as defendant's reply brief acknowledges, almost all the comments of which defendant complains occurred outside the presence of the jury, so there is little chance the judge's comments affected the verdict. The majority of the most problematic comments belittled the State's side of the case, rather than defendant's. Moreover, as explained above, the evidence against defendant was overwhelming. We are confident that the jury reached the correct result, regardless of the trial court judge's problematic commentary, and his comments do not rise to the level of reversible error in this case. See *Johnson*, 2012 IL App (1st) 091730, ¶ 76; see also *People v. Sims*, 192 Ill. 2d 592, 636 (2000) ("Judicial comments can amount to reversible error if the defendant can establish that such comments were a material factor in the conviction or were such that an effect on the jury's verdict was the probable result." (Internal quotation marks omitted.)).

¶ 56    Defendant insists that these "proceedings were impacted as a result of [the trial court judge's behavior]," but he does not explain how beyond making a generalized claim that the trial court judge created "an environment of hostility." That is not sufficient to establish prejudice as to defendant specifically. Furthermore, the cases defendant cites do not compel reversal. See, *e.g.*, *People v. Shelton*, 401 Ill. App. 3d 564, 583 (2010) (aggravated battery conviction affirmed over the defendant's claim of trial court bias); *People v. Harris*, 384 Ill. App. 3d 551, 561-67 (2008) (murder guilty plea affirmed over the defendant's claim of trial court bias). Accordingly, we will not reverse defendant's convictions based on the trial court judge's commentary.

¶ 57                              C. Sufficiency of the Evidence

¶ 58    Defendant next contends that the State did not introduce sufficient evidence to prove him guilty because the State failed to disprove his affirmative defense of consent. When reviewing a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the State, any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. McLaurin*, 2020 IL 124563, ¶ 22. We draw all reasonable inferences in the State's favor. *People v. Jones*, 2023 IL 127810, ¶ 28. We do not retry the defendant, and we will not substitute our judgment for that of the trier of fact on matters of witness credibility or the weight of the evidence. *McLaurin*, 2020 IL 124563, ¶ 22. We will only reverse a conviction if "the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Jones*, 2023 IL 127810, ¶ 28.

¶ 59    Relevant here, a defendant commits aggravated criminal sexual assault when he commits criminal sexual assault and causes bodily harm to the victim. 720 ILCS 5/11-1.30(a)(2) (West 2018). A defendant commits criminal sexual assault when he commits an act of sexual penetration

using force or threat of force. *Id.* § 11-1.20(a)(1). The use or threat of force includes, but is not limited to, "(1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat" or "(2) when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." *Id.* § 11-0.1.

¶ 60    A defendant commits kidnapping when he knowingly and secretly confines another against her will (*id.* § 10-1(a)(1)). Kidnapping becomes aggravated kidnapping when the defendant inflicts great bodily harm or commits another felony upon the victim (*id.* § 10-2(a)(3)). A defendant commits aggravated battery when he commits battery and strangles another individual in doing so. *Id.* § 12-3.05(a)(5).

¶ 61    Defendant does not challenge the State's proof of any of these elements. Rather, he claims that he raised an affirmative defense of consent that the State failed to disprove. A defendant may raise consent as a defense to aggravated criminal sexual assault. *Id.* § 11-1.70(a). Consent means a "freely given agreement to the act of sexual penetration or sexual conduct in question." *Id.* § 11-0.1. When a defendant raises consent as an affirmative defense, the State must prove lack of consent beyond a reasonable doubt. *People v. Haywood*, 118 Ill. 2d 263, 274 (1987). In sexual assault cases, force and consent are two sides of the same coin, and by proving the use of force, the State necessarily proves lack of consent. *People v. Torres*, 2015 IL App (1st) 120807, ¶ 61; see also *People v. Roberts*, 182 Ill. App. 3d 313, 317 (1989) ("Consent is the very antithesis of force.").

¶ 62    At trial, defendant denied using any force during his sexual encounter with J.S. But the evidence established that defendant, despite his testimony to the contrary, used force to compel J.S. to have sex with him. J.S. unequivocally testified that that she did not consent to having sex

with defendant. On the contrary, she wanted to leave defendant's apartment. But when she tried to leave, defendant punched her in the neck, choked her from behind, put his hand over her mouth, and held her nose shut until she lost consciousness. Defendant also repeatedly yelled that she could not leave. J.S. described how defendant violently forced his penis into her mouth and had unprotected vaginal and anal sex with her, ignoring her pleas that he wear a condom.

¶ 63    As discussed above, multiple witnesses corroborated J.S.'s account. Marcus testified that he saw bruises on her neck shortly after the incident. Dr. Yuksel diagnosed J.S.'s injuries as the products of sexual and physical assault. Those injuries were documented in photographs that the jury was able to view. DNA evidence connected defendant to J.S.'s neck injuries. A reasonable factfinder could conclude that defendant forced J.S. to have sex with him, defeating his consent defense. Accordingly, we reject defendant's challenge to the sufficiency of the evidence.

¶ 64                    D. Ineffective Assistance of Counsel

¶ 65    Defendant contends that trial counsel was ineffective for failing to (1) file a motion to suppress defendant's statements based on his arrest pursuant to an investigative alert, (2) object to the exclusion of evidence that J.S. was a sex worker, and (3) object to R.B.'s other-crimes evidence. To establish ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant must show (1) that counsel's performance was objectively unreasonable and (2) prejudice, *i.e.*, that there is a reasonable probability the result of the proceeding would have been different but for counsel's deficient performance. *People v. Patterson*, 2014 IL 115102, ¶ 81. We review claims of ineffective assistance of counsel under a bifurcated standard in which we defer to the trial court's findings of fact unless they are against the manifest weight of the evidence

but review *de novo* the ultimate legal issue of whether counsel's actions support a claim of ineffective assistance. *People v. Ortega*, 2020 IL App (1st) 162516, ¶ 24.

¶ 66                                                    1. Motion to Suppress

¶ 67    Defendant first argues that counsel failed to file a motion to suppress his statement based on his arrest pursuant to an investigative alert, which defendant contends was unconstitutional. The decision whether to seek suppression of evidence and what theory of suppression to argue are generally matters of trial strategy that will not support a claim of ineffective assistance. *People v. Balark*, 2019 IL App (1st) 171626, ¶ 34; *People v. Rodriguez*, 312 Ill. App. 3d 920, 925 (2000). To establish prejudice resulting from the failure to file a motion to suppress, a defendant must show that the motion to suppress would have been meritorious and there is a reasonable probability that the outcome of the trial would have been different had the evidence been suppressed. *People v. Gayden*, 2020 IL 123505, ¶ 28.

¶ 68    In July 2019, one division of this court held that "an arrest [is] unconstitutional when effectuated on the basis of an investigative alert issued by the Chicago Police Department." *People v. Bass*, 2019 IL App (1st) 160640, ¶ 71. However, our supreme court vacated that analysis in April 2021. *People v. Bass*, 2021 IL 125434, ¶ 31. Even before our supreme court's ruling, this court rejected *Bass* as wrongly decided and held that the use of an investigative alert to arrest a suspect is constitutional so long as the investigative alert is supported by probable cause. *People v. Braswell*, 2019 IL App (1st) 172810, ¶ 39. This court followed *Braswell* in the years after it was decided. See, *e.g.*, *People v. Little*, 2021 IL App (1st) 181984, ¶¶ 63-64; *People v. Simmons*, 2020 IL App (1st) 170650, ¶¶ 62-64; *People v. Bahena*, 2020 IL App (1st) 180197, ¶¶ 59-64; *People v. Thornton*, 2020 IL App (1st) 170753, ¶¶ 45-50.

¶ 69　A motion to suppress based on defendant's arrest pursuant to an investigative alert would not have been legally meritorious. Defendant was arrested on November 28, 2018. He filed his motion to suppress on September 21, 2021, and proceeded to trial on August 9, 2022. So, for most of the time when trial counsel could have filed a motion to suppress, arguing that defendant's arrest pursuant to an investigative alert was unlawful, either (1) there was no Illinois authority supporting such an argument, (2) the weight of First District authority rejected that argument, or (3) Illinois Supreme Court authority rejected that argument. Counsel's decision not to argue this theory of suppression was not objectively unreasonable, particularly given that counsel filed the motion to suppress after our supreme court issued its opinion in *Bass*.

¶ 70　We acknowledge that there was a five-month window between July 25, 2019, when *Bass* was decided, and December 26, 2019, when *Braswell* was decided, during which *Bass* was the primary First District authority on investigative alerts. Even if counsel had filed a motion to suppress challenging the investigative alert during this window, the record suggests that the trial court would have found independent probable cause to arrest defendant, based on J.S.'s identification of him regardless of *Bass*.[3] Furthermore, arguing this theory of suppression would not have changed the evidence presented at trial. The statement defendant sought to suppress concerned his April 2018 sexual assault of R.B., not his August 2018 assault of J.S. The State planned to use defendant's statement only if R.B. was unavailable to testify, or for impeachment or rebuttal. Ultimately, the State did not use defendant's statement at all. Therefore, there is no likelihood that a successful motion to suppress defendant's statement about R.B. would have

---

[3]The trial court was aware of *Bass*. During a motion to suppress hearing, when trial counsel said, "[T]his is a case where [defendant] was arrested on an investigative alert," the court responded, "Bass, [B]ass, [B]ass, [B]ass. *** If there's probable cause to arrest your client, the best lawyer means nothing whatsoever."

changed the outcome of trial. Defendant cannot establish prejudice under *Strickland*. See *Gayden*, 2020 IL 123505, ¶ 28.

¶ 71    Defendant essentially argues that, had counsel moved to suppress defendant's statement based on his arrest pursuant to an investigative alert, the trial court would have been obligated to follow *Bass* and grant the motion. We disagree for the reasons stated above. Additionally, the fact that some justices dissented in the supreme court decision that vacated *Bass*'s analysis of the constitutionality of investigative alerts does not mean that the trial court would have been obligated to follow those dissents.[4] Dissents have no precedential value. *People v. Smythe*, 352 Ill. App. 3d 1056, 1061 (2004).

¶ 72    Defendant also cites *People v. Smith*, 2022 IL App (1st) 190691, ¶ 66, in which a division of this court held that the defendant's warrantless arrest was unlawful because it was premised solely on an investigative alert issued six months earlier and the arresting officer had no other reason to believe that the defendant committed a crime. *Id.* ¶ 66. Neither of those factors exist in this case. We also note that other divisions of this court have declined to follow *Smith* and have continued to follow *Brasswell*. See, *e.g.*, *People v. Streater*, 2023 IL App (1st) 220640, ¶ 70. Accordingly, defendant has not established ineffective assistance of counsel for failing to file a motion to suppress premised on *Bass* and his arrest pursuant to an investigative alert.

¶ 73                    2. Sex Worker Evidence

---

[4]Defendant's reply brief appears to concede that the trial court would not have been obligated to follow *Bass*. According to defendant, "[w]ith dissents on this issue at the Illinois Supreme Court, one can hardly say that there is prevailing or well settled law on the use of investigative alerts." We do not necessarily agree with that description of the law, but assuming that defendant is correct, that means it is not at all clear that a motion to suppress challenging the legality of defendant's arrest would have been successful.

¶ 74 Defendant also contends that trial counsel failed to object to the State's motion *in limine* to exclude evidence that J.S. was a sex worker whose internet profile invited customers to engage in "rough sex." The trial court barred this evidence pursuant to the "rape shield statute," section 115-7 of the Code (725 ILCS 5/115-7 (West 2018)). Section 115-7 bars evidence of a victim's prior sexual activity or reputation, with two exceptions: (1) evidence of the victim's past sexual activities with the defendant is admissible when offered as evidence of consent and (2) where the admission of such evidence is "constitutionally required." *Id.*; *People v. Santos*, 211 Ill. 2d 395, 401-02 (2004). Defendant does not claim that he and J.S. had prior consensual sexual encounters, so only the second exception is at issue. That exception allows a defendant to offer evidence of the victim's prior sexual activity that is directly relevant to matters at issue in the case. *People v. Okoro*, 2022 IL App (1st) 201254, ¶ 55. That is, a "defendant's constitutional right to cross examine a witness is not defeated by the statute where the evidence of a victim's past sexual conduct is relevant and tends to establish bias, motive, or prejudice." *Id.*

¶ 75 We find that trial counsel did not render ineffective assistance in opposing the State's motion *in limine* to exclude evidence that J.S. was a sex worker. First, trial counsel successfully contended that the court should admit evidence that defendant arranged via the internet to have sex with J.S. in exchange for money on August 1, 2018. Counsel's decision not to object to the exclusion of J.S.'s prior or subsequent activities as a sex worker may have been the product of sound trial strategy and does not necessarily indicate deficient performance. See *People v. Evans*, 209 Ill. 2d 194, 221 (2004). That is particularly true because there is virtually no chance the trial court would have allowed such evidence. Illinois courts have long held that section 115-7 bars evidence of a victim's history as a sex worker. See, *e.g.*, *People v. Ivory*, 139 Ill. App. 3d 448, 453

(1985); *People v. Hughes*, 121 Ill. App. 3d 992, 997-98 (1984); *People v. Newman*, 123 Ill. App. 3d 43, 44-45 (1984). Because counsel's objection to the exclusion of this evidence almost certainly would have been unsuccessful, defendant cannot establish prejudice under *Strickland*. Furthermore, the jury likely inferred that J.S. was a sex worker anyway. The jury heard through both the State and the defense that J.S. arranged to meet a man she did not know for sex in exchange for payment for a set time period. The acknowledgement that J.S. initially planned to be paid for sex did not result in an acquittal, so we cannot see how referring to her at trial as a sex worker would have resulted in an acquittal either. We conclude that defendant has failed to establish both prongs of the *Strickland* test with respect to this issue.

¶ 76    Defendant argues that trial counsel's failure to oppose the State's motion *in limine* prevented him from "argu[ing] that J.S. may have [had] marks on her neck due to her own commercial sexual activity, specifically, her invitation to her customers to engage in fetish activity and rough sex." The suggestion that another person, not defendant, caused J.S.'s injuries is speculation, defendant has never offered a good faith basis for making that claim, and we have seen no such basis in the record. DNA evidence connected J.S.'s neck injuries to defendant. Accordingly, we reject defendant's claim of ineffective assistance of counsel based on counsel's alleged failure to oppose the State's "rape shield statute" motion *in limine*.

¶ 77                                3. Other-Crimes Evidence

¶ 78    Defendant's final claim of ineffective assistance of counsel concerns the admission of other-crimes evidence that defendant sexually assaulted R.B. four months before sexually assaulting J.S. Defendant essentially contends that counsel was not zealous enough in arguing

against the State's motion *in limine* to admit other-crimes evidence or against the trial court's decision to grant that motion.

¶ 79 In general, evidence of other crimes or bad acts is admissible "to prove intent, *modus operandi*, identity, motive, absence of mistake, and any material fact other than propensity that is relevant to the case." *Donoho*, 204 Ill. 2d at 170; Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Section 115-7.3 of the Code allows the use of other-crimes evidence in cases where the defendant is accused of sex offenses including aggravated criminal sexual assault. 725 ILCS 5/115-7.3(a), (b) (West 2018). Prior to admitting other-crimes evidence in such cases, the trial court must weigh the probative value of the evidence against the undue prejudice to the defendant and consider "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." *Id.* § 115-7.3(c). Section 115-7.3 allows evidence of other crimes to demonstrate a defendant's propensity to commit sex offenses (*Donoho*, 204 Ill. 2d at 176) and to rebut a defendant's claim of consent (*People v. Boyd*, 366 Ill. App. 3d 84, 93 (2006)).

¶ 80 The record shows that trial counsel vigorously argued against the admission of other-crimes evidence. While counsel correctly conceded that defendant's assaults of R.B. and J.S. were close in time, counsel ably distinguished the facts of the two incidents. Counsel highlighted that R.B. was in a long-term relationship with defendant and had a child with him, whereas J.S. was a sex worker he did not know prior to seeing her online profile. Counsel also noted that defendant's sexual assault of R.B. involved only vaginal penetration, not oral and anal penetration as occurred during his assault of J.S. Additionally, counsel argued that R.B. did not suffer any injuries that resulted in hospitalization, unlike J.S. While counsel's arguments were ultimately unsuccessful,

they were entirely appropriate for opposing a motion to admit other-crimes evidence. Based on this record, defendant cannot establish the deficient performance prong of *Strickland*.

¶ 81    Defendant cannot establish prejudice under *Strickland*, either. Section 115-7.3 allows the admission of other-crimes evidence to show propensity more broadly in sex offense cases than in almost any other type of case. *People v. Walston*, 386 Ill. App. 3d 598, 613 (2008) ("[S]ection 115-7.3 creates a broad exception to the rule by reversing it entirely in sex-offense cases: the statute states that other-crimes evidence is admissible even to show propensity."). As a result, the trial court has broad discretion to admit other-crimes evidence pursuant to section 115-7.3. *Id.* at 620, 626. We are unconvinced that the trial court would have excluded R.B.'s testimony had trial counsel argued this issue any differently. Tellingly, defendant does not identify what other arguments counsel should have made. Accordingly, we affirm defendant's convictions over his claims of ineffective assistance of counsel.

¶ 82                            E. Cumulative Error

¶ 83    Defendant argues that all the alleged errors discussed above resulted in cumulative error that denied him a fair trial. We may grant a new trial on grounds of cumulative error when individual errors that were not sufficiently egregious to warrant a new trial nevertheless created a pervasive pattern of unfair prejudice to the defendant. *People v. Green*, 2017 IL App (1st) 152513, ¶ 117. "However, the cumulative errors that warrant such an extreme result must themselves be extreme." (Internal quotation marks omitted.) *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 110. "There generally is no cumulative error where the alleged errors do not amount to reversible error on any individual issue." *Green*, 2017 IL App (1st) 152513, ¶ 118.

¶ 84    As explained above, we find two errors in this trial: the inadequate Rule 431(b) admonishments and the trial court judge's improper commentary. Neither error is reversible on its own; so, following the general rule, we cannot find cumulative error. See *id.* Practically speaking, we struggle to see how the errors defendant alleges combined to produce a trial that was pervasively unfair to him. The evidence against defendant was overwhelming, and the jury expressed no doubt or hesitation before finding him guilty on all counts. The record does not support defendant's claim of cumulative error; accordingly, we reject this argument.

¶ 85                                 F. Sentencing

¶ 86    Finally, defendant contends that his 85-year sentence is excessive because (1) it is significantly more than what the State offered in plea negotiations, (2) it will not restore him to useful citizenship, (3) the trial court imposed a "trial tax," (4) the court misstated the facts of the case during the sentencing hearing, (5) the court described defendant as "Mr. Hyde," a fictional character who is a murderer, (6) the court did not consider "any mitigating factors from [defendant's] PSI report," (7) the court improperly emphasized defendant's absence at the sentencing hearing, and (8) the court erroneously relied on other-crimes evidence in sentencing defendant in this case.

¶ 87    The parties agree that the minimum total sentence was 24 years—6 years on each of the four Class X counts—and the maximum total sentence was 120 years—30 years on each Class X count. See 730 ILCS 5/5-4.5-25(a) (West 2018) (the sentencing range for Class X felonies is 6 to 30 years in prison). Defendant's 85-year sentence is in the middle of that range. Therefore, we presume that the sentence is proper. See *People v. McGuire*, 2016 IL App (1st) 133410, ¶ 12.

¶ 88 The State argues that defendant has forfeited the claims of sentencing error he raises on appeal because his motion to reconsider sentence did not raise those claims and he does not seek plain error review. As noted above, defendant's motion to reconsider sentence is not included in the record on appeal. At the hearing on that motion, defendant argued only that consecutive sentences on the Class X felonies were improper and that the court should consider Kaminski and Kitchen's mitigation testimony.

¶ 89 A defendant must raise claims of sentencing error by objecting at the sentencing hearing and in a motion to reconsider sentence. *Id.* If a defendant fails to take either of these steps, he forfeits claims of sentencing error. *Id.* In that scenario, we may review claims of sentencing error only for plain error. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 90 We agree with the State that defendant has forfeited the claims of sentencing error he raises on appeal. The record contains no indication that defendant raised any of these claims in the trial court at any point. While defendant's motion to reconsider sentence may have raised some of these claims, it is not in the record on appeal, and we construe any deficiencies in the record against defendant. See *People v. Jones*, 2021 IL App (1st) 181266, ¶ 35 (citing *People v. Davis*, 231 Ill. 2d 349, 365 (2008)). Furthermore, defendant does not request plain error review of any of these issues. Accordingly, we find that defendant has forfeited his claims of sentencing error, and we affirm his 85-year sentence.

¶ 91 Finally, the mittimus states that defendant's five-year sentence relates to a conviction for aggravated criminal sexual abuse (720 ILCS 5/11-1.60(a)(6) (West 2018)) instead of aggravated battery (*id.* § 12-3.05(a)(5)). Counts XIX, XX, and XXI of the indictment charged defendant with aggravated criminal sexual abuse, pursuant to section 11-1.60(a)(6), but the State dismissed those

counts prior to trial. The record makes clear that defendant was convicted of aggravated battery under section 12-3.05(a)(5). A reviewing court may correct the mittimus at any time. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 86. Accordingly, we direct the clerk of the circuit court to correct the mittimus to reflect that defendant was convicted of aggravated battery, not aggravated criminal sexual abuse. See *People v. Gordon*, 378 Ill. App. 3d 626, 641 (2007); Ill. S. Ct. R. 615(b)(1) (eff. Jan. 1, 1967).

¶ 92                                III. CONCLUSION

¶ 93    For the foregoing reasons, we affirm defendant's convictions and sentence, and correct the mittimus to reflect that defendant was convicted of aggravated battery, rather than aggravated criminal sexual abuse.

¶ 94    Affirmed; mittimus corrected.

¶ 95    PRESIDING JUSTICE REYES, specially concurring:

¶ 96    I agree with the majority's well-reasoned criticisms of the trial court's improper commentary. I also share the view of the majority that such commentary—while undeniably problematic—did not prejudice defendant and thus did not rise to the level of reversible error. I write separately, however, to express my concern regarding the broader consequences of such commentary.

¶ 97    To state the obvious, a trial court should not engage in disparaging or derisive communications with or about any party, witness, prospective juror, court employee, attorney, or public official. Beyond the potential implications of a trial court's indecorous remarks on the fate of a criminal defendant, those remarks may cause distress to other participants in the legal process. Given that judges serve as the public face of our justice system, they should exercise their

considerable power in a manner that preserves and promotes the integrity of the system. Inappropriate comments by a jurist may not only demoralize the participants in the legal process but may indeed diminish the public's faith in the validity and fairness of the process itself.

***People v. Kline*, 2024 IL App (1st) 221595**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-CR-326; the Hon. Stanley J. Sacks, Judge, presiding. |
| **Attorneys for Appellant:** | Andrea D. Lyon and E. Kate Cohn, of Lyon Law, LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Brian A. Levitsky, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |