2026 IL App (1st) 240359-U
No. 1-24-0359

SIXTH DIVISION
March 27, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 12384 |
| | ) | |
| SHERELL STAFFORD, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices C.A. Walker and Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's sentence for first degree murder is reversed and the cause remanded for a new sentencing hearing.

¶ 2    Following a jury trial, defendant Sherell Stafford was convicted of first degree murder and sentenced to 38 years in prison. On appeal, defendant argues that his sentence is excessive because the trial court failed to adequately consider mitigating factors, constituting plain error, and alternatively, that his counsel was ineffective for failing to present mitigating evidence. For the following reasons, we reverse defendant's sentence and remand for a new sentencing hearing.

¶ 3     Defendant was charged by indictment with multiple counts of first degree murder arising from the shooting death of Keiwaun Crayton. The State proceeded on counts of first degree murder for knowingly and intentionally shooting and killing Crayton (count V) and for shooting Crayton with knowledge that doing so posed a strong probability of death or great bodily harm (count VI). 720 ILCS 5/9-1(a)(1), (2) (West 2020). Both counts charged that defendant personally discharged a firearm that proximately caused death.

¶ 4     At trial, Wade Ingram testified that he was seated on a Red Line train at about 4:18 p.m. on August 19, 2021, when a man, later identified as Crayton, walked through the train car selling cigarettes. Two people approached Crayton. Then, Ingram heard gunshots and saw people scrambling around the train car, screaming. Ingram checked on Crayton, who had been shot. On cross-examination, Ingram stated that he did not see in court either of the individuals who approached Crayton.

¶ 5     The parties stipulated that a medical examiner determined that Crayton's cause of death was multiple gunshot wounds and the manner of death was homicide.

¶ 6     Police officers testified that, in investigating the scene, they recovered three fired shell cartridge casings, a box cutter, and a McDonald's cup and straw. The parties also stipulated that a forensic scientist would testify that DNA taken from the straw matched the DNA of defendant. The parties further stipulated that a forensic scientist would testify that fingerprints lifted from the McDonald's cup matched defendant's fingerprints.

¶ 7     The State published security footage of the incident, which is included in the record on appeal and has been viewed by this court. The video shows defendant and two other individuals confront Crayton in a train car, with passengers occupying seats nearby. Crayton produces an object from his pocket and lunges at defendant. Defendant reaches into his own pants, while falling

2

backwards into a seat. Crayton and defendant wrestle in the seat, and Crayton falls backwards to the floor. Defendant rises from the seat and shoots Crayton, then turns and runs away. Further video evidence shows defendant and his two companions exiting the train at the next stop and boarding a bus, and defendant shaking hands with one of his companions.

¶ 8 Defendant testified that he boarded the train with two friends. Defendant had a firearm in his pants. Crayton walked past, selling cigarettes. Neither defendant nor his friends spoke to Crayton. Defendant and his friends attempted to advance to the next train car, but Crayton, who was standing on the other side of the door, would not let them through. Crayton eventually walked away from the door. Defendant and his friends moved through the train until they saw Crayton. Defendant testified that he and his friends confronted Crayton because they wanted to understand why he had blocked them.

¶ 9 According to defendant, Crayton produced a knife. Defendant reached for his firearm and attempted to step away from Crayton. Crayton "charged" at defendant, "slicing" him several times. Defendant fell backwards into a seat. The firearm fell from his hands. Defendant and Crayton struggled over the firearm, which discharged. Crayton rose and retreated. Defendant rose and "[g]ot [the] gun pointed and shot" "one time," but testified, "[i]t wasn't like I was aiming." Then, defendant ran.

¶ 10 The evidence at trial established that defendant started a confrontation with Crayton and then shot him, shooting again as Crayton was on the ground. Defendant shot Crayton multiple times in an occupied rail car, endangering other passengers, then fled the scene.

¶ 11 The jury found defendant guilty of first degree murder, including personal discharge of a firearm.

¶ 12 Defendant filed a motion for a new trial, which the trial court denied.

¶ 13    The presentence investigation report, which is included in the record on appeal, set forth defendant's version of the incident. Defendant stated that he only carried a firearm for protection and that Crayton sliced at defendant with the knife first.

¶ 14    According to the report, defendant was 17 years old at the time of the shooting and denied experiencing abuse or neglect as a child. Defendant was close with his siblings and had one older brother who had been killed. Defendant reported a "good" relationship with his son, with whom he spoke daily, and "does his best to support his son, financially and otherwise." He also reported a "good" relationship with his girlfriend.

¶ 15    The report indicated that defendant was arrested for unlawful use of a weapon on January 3, 2020, and was sentenced to two years of probation. Defendant was taken into custody during his junior year of high school for shooting Crayton. He attained a high school diploma from an alternative school in August 2023. Previously, defendant worked at a Popeye's restaurant and was on his high school's soccer team. He hoped to pursue trade school for carpentry.

¶ 16    Defendant described his neighborhood as a high crime and dangerous area, with shootings and no police presence. Between the ages of 15 and 18, defendant was involved with the gang "MMG" but held no rank or role, and he was no longer affiliated with the gang.

¶ 17    Defendant reported that he suffered from asthma and had been diagnosed with ADHD. The presentence investigation report also noted that defendant was shot in his left hand in 2018 and stabbed in his left arm in 2019.

¶ 18    Defendant reported that he began to regularly drink alcohol at age 17 but only drank on special occasions. He used Percocet and ecstasy weekly from age 17 until his arrest. While on probation for the unlawful use of a weapon charge, defendant completed a two-year drug treatment program, and he stated that he would consider undergoing another treatment program.

¶ 19   The cause proceeded to a sentencing hearing on January 18, 2024.

¶ 20   At sentencing, the State argued that defendant needlessly confronted Crayton and endangered everyone in the train car. The State also published a statement by Crayton's mother, who described her depression at losing her son and asked the trial court to impose a sentence "that is deserved."

¶ 21   In allocution, defendant stated that he confronted Crayton to learn whether Crayton had mistaken defendant for someone else when Crayton blocked defendant from moving between train cars. Defendant stated that he acted in self-defense, that he did not mean to kill Crayton, and that he regretted that Crayton died. Defendant added that he carried a firearm that day for protection, and that his mother had also experienced the loss of a child.

¶ 22   Defendant's counsel argued that defendant had no history of violence or "any major issues with the law." Counsel argued that defendant fled the scene and failed to turn himself in due to fear.

¶ 23   The trial court stated that it had reviewed the presentence investigation report "two or three" times. The trial court noted defendant's youth at the time of the shooting, as well as the "attending circumstances." In particular, the trial court noted defendant's prior probation, defendant's reportedly good relationship with his family, and that his brother had been killed. The court acknowledged defendant's employment, participation on his school's soccer team, asthma and ADHD, and that he had no history of incidents while in custody. The trial court also noted defendant's good relationship with his child and his aspiration to learn carpentry. The trial court observed that defendant was already armed with a firearm when he entered the train, that defendant and his friends followed Crayton through the train, and that after exiting the train, defendant was "almost gloating about it, shaking hands with the other two guys."

¶ 24    The trial court stated that it had considered all the statutory factors in mitigation, including the additional statutory juvenile sentencing factors. It noted the factors included a person's age, impetuosity, level of maturity at the time of the offense, ability to consider risks and consequences of behavior, and presence of cognitive or developmental disability or both, if any. It then discussed many of the juvenile sentencing factors, reiterating defendant's youth at the time of the shooting.

¶ 25    Regarding impetuosity, the trial court stated that defendant was with two friends at the time of the shooting and that he had the firearm. The court found defendant was not coerced to shoot or subject to peer pressure; he chose to shoot. The trial court found no indication that defendant had suffered parental neglect, physical abuse, or other childhood trauma, noting defendant reported he came from a good family and was not abused. The court noted "there might be a little bit of drama" in defendant's family, but such would not affect defendant's conduct on the day of the shooting. The trial court further found that defendant had potential for rehabilitation. As for the circumstances of the offense, the trial court stated that while the killing was not planned beforehand, defendant "shot [Crayton] himself," and the evidence did not support that he shot Crayton in self-defense.

¶ 26    The court found defendant was able to meaningfully participate fully in his defense, and he had expressed remorse. The court then told defendant there were consequences for murdering a man on a train, noting the video depicted defendant shaking hands with his friends when he exited the train. In its remarks, the court did not mention defendant's involvement or lack thereof in the child welfare system, defendant's involvement in the community, or the outcomes of any comprehensive mental health evaluation of defendant.

¶ 27    The court merged first degree murder count VI into first degree murder count V and imposed 38 years' imprisonment on count V. The trial court did not impose a firearm enhancement.

¶ 28    Defendant did not file a motion to reconsider his sentence.

¶ 29    On appeal, defendant first argues that his sentence is excessive because the trial court failed to adequately consider factors in mitigation. Defendant acknowledges he failed to preserve the issue for review, but requests plain error review.

¶ 30    A defendant must preserve an alleged sentencing error by objecting at the sentencing hearing and filing a motion to reconsider sentence. *People v. Kline*, 2024 IL App (1st) 221595, ¶ 89. Defendant failed to do so and therefore forfeited his claims of sentencing error. *Id.* When such claims are forfeited, the reviewing court may only review claims of sentencing error for plain error. *Id.*

¶ 31    Supreme Court Rule 615(a) states that a reviewing court may take notice of plain errors or defects affecting substantial rights although they were not brought to the attention of the trial court. Ill. S. Ct. R. 615(a) (eff. Jan 1, 1967). To establish plain error in the context of sentencing, the defendant must show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *People v. Brown*, 2017 IL App (1st) 142877, ¶ 62. Defendant requests review under both prongs. The first step is to determine whether any error occurred. *Id.* ¶ 63.

¶ 32    A sentence must reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship. *People v. Williams*, 2019 IL App (1st) 173131, ¶ 21. Therefore, in imposing a sentence, the trial court must consider all factors in aggravation and mitigation. *Id.* The factors in aggravation include the harm caused by the defendant's conduct, the defendant's criminal history, and the need for deterrence. 730 ILCS 5/5-5-3.2(a) (West 2020).

¶ 33    For purposes of sentencing, the trial court is better positioned than a reviewing court to consider such factors as the defendant's credibility, demeanor, moral character, mentality,

environment, habits, and age. *People v. Sims*, 2022 IL App (2d) 200391, ¶ 164. Thus, the trial court has broad discretionary powers to determine the appropriate sentence, and is afforded great deference. *People v. Elliot*, 2022 IL App (1st) 192294, ¶ 57. Where, however, the record affirmatively shows the court proceeded under an incomplete statutory framework, the error is legal, not discretionary, and is reviewed *de novo*. *People v. Johnson*, 2024 IL 130191, ¶ 51.

¶ 34    In imposing a sentence, the trial court must consider all factors in aggravation and mitigation. *People v. Williams*, 2019 IL App (1st) 173131, ¶ 21. The Code of Corrections mandates that, in sentencing an individual who was under the age of 18 at the time of an offense, the trial court consider certain enumerated factors. On January 1, 2024, the relevant statutory provision was amended to expand the enumerated factors from 9 to 12. Pub. Act. 103-191, § 10 (eff. Jan. 1, 2024) (amending 730 ILCS 5/5-4.5-105). Thus, at defendant's sentencing hearing on January 18, 2024, the trial court was required to consider:

> "(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;
>
> (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;
>
> (3) the person's family, home environment, educational and social background, including any history of parental neglect, *domestic or sexual violence, sexual exploitation, physical abuse*, or other childhood trauma, *including adverse childhood experiences (or ACEs)*;
>
> (4) the person's potential for rehabilitation or evidence of rehabilitation, or both;
>
> (5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history;

(9) *the person's involvement in the child welfare system*;

(10) *involvement of the person in the community*;

(11) *if a comprehensive mental health evaluation of the person was conducted by a qualified mental health professional, the outcome of the evaluation*; and

(12) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." (Emphasis added to italicized portions that became effective January 1, 2024.) 730 ILCS 5/5-4.5-105(a) (West 2024).

¶ 35    The version of section 5-4.5-105(a) in effect at the time of sentencing governed. See *People v. Clark*, 2024, IL 127838, ¶ 73 (holding version of section 5-4.5-105(a) in effect at sentencing applied, even though offense occurred before effective date). Accordingly, the sentencing court was required to consider—and specify on the record—its consideration of all 12 factors. 730 ILCS 5/5-4.5-105(b) (West 2024) ("The trial judge shall specify on the record its consideration of the factors under subsection (a) of this Section."). The court's failure to do so was, therefore, error. See *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 65 (reviewing *de novo* whether defendant affirmatively showed court failed to comply with sentencing statute). Consequently, defendant's sentence is reversed. See *People v. Williams*, 188 Ill. 2d 365, 369 (1999) ("Where a trial court's

9

exercise of discretion has been frustrated by an erroneous rule of law, appellate review is required to permit the exercise of discretion consistent with the law.").

¶ 36     In so holding, we neither reweigh any sentencing factors nor impose a sentence. Rather, we direct the sentencing court to exercise its discretion within the bounds of the law when resentencing defendant. See *id.*

¶ 37     Reversed and remanded with directions.