2026 IL App (2d) 250061
No. 2-25-0061
Opinion filed June 9, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

PATRICIO J. SALAS-PINEDA, Defendant-Appellant.

Appeal from the Circuit Court of Kane County.
Honorable Julia A. Yetter, Judge, Presiding.
No. 24-CF-10

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Hutchinson and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Patricio J. Salas-Pineda, appeals his conviction of aggravated criminal sexual assault (dangerous weapon) (720 ILCS 5/11-1.30(a)(1) (West 2022)). Defendant argues that his trial counsel denied him the effective assistance of counsel by failing to elicit testimony from the victim, M.M., that would have supported his consent defense and created a reasonable probability of acquittal. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3     On January 2, 2024, defendant was charged with committing multiple offenses on December 30, 2023, against his then-girlfriend, M.M. After a jury trial, he was convicted of, *inter alia*, (1) aggravated criminal sexual assault (*id.*) for placing his penis in M.M.'s sex organ by force or threat of force while displaying, using, or threatening to use a dangerous weapon, *i.e.*, a

knife; (2) aggravated domestic battery (*id.* § 12-3.3(a-5)) for causing bodily harm to M.M. by intentionally impeding her normal breathing through pressure applied to her neck or throat; (3) aggravated unlawful restraint (*id.* § 10-3.1(a)) in that, while armed with a deadly weapon, he prevented M.M. from leaving her residence; and (4) domestic battery (*id.* § 12-3.2(a)(1)) for causing bodily harm to M.M. by grabbing or striking her on or about her head, neck, throat, or body. On appeal, he challenges only the aggravated criminal sexual assault conviction.

¶ 4                                      A. Initial Detention Hearing

¶ 5      On January 2, 2024, the public defender was appointed to represent defendant. Also on that date, the State filed a petition to deny defendant pretrial release (see 725 ILCS 5/110-6.1 (West 2022)) and the trial court held a hearing on the petition. The State tendered the charging document, defendant's criminal history, and an extensive police synopsis. We detailed the synopsis in our prior opinion and prior order in this matter. See *People v. Salas-Pineda*, 2024 IL App (2d) 240124, ¶¶ 7-27; *People v. Salas-Pineda*, 2024 IL App (2d) 240017-U, ¶¶ 7-27.

¶ 6      At the hearing on the petition, the State argued:

"[T]he complaining witness M.M., she—when the deputies responded, she provided an explanation of what had occurred. Their observations were that there were items thrown throughout the house. There was [*sic*] chairs overturned.

She gave a description as to what had occurred; the strangulation, the other acts that were against her. And that they did observe multiple injuries on her face, her head, her neck, and her back, and noticed redness in her eyes.

She had indication [*sic*] that the defendant took her phone that prevented her from calling 911. And that he had choked her over the several hours that he was with her approximately 50 times, that he held a knife to her, threatened her.

They were able to seek—or she indicated that she had eventually sent a text saying help to some family members who ultimately went to her residence. One of them did physically remove the defendant from the house. And that is how the authorities were able to get involved. She indicated that this was an act that began simply with jealously [*sic*] from the defendant.

When she was ultimately interviewed again by the sheriff's department, her recitation of what had occurred was consistent with what she told the responding deputies as to the incident including defendant's threat of violence against her, choking her, sexually assaulting her, preventing her from calling the police.

When the defendant was interviewed, he did admit to taking her phone. While, of course, his version differs, he said that M.M. was the one who actually grabbed a knife from him when he was cutting up a lime. They noted that the details were pretty inconsistent. And I do point out that he admits that he was upset, that she was lying to him, and that she was cheating on him.

So, Judge, I think based on the statements of M.M. which is [*sic*] corroborated by what is seen from the responding officers and the detectives. *** It is clear and convincing that the evidence—or is the presumption great that the defendant did commit a detainable offense. Two, that he poses a real and present threat to the physical safety of a specific identifiable person or persons or the community as a whole.

Judge, this was an act of violence with a woman who he only had a two-month relationship with. This wasn't a quick instance. It went on for several hours in which he terrorized this woman in her own home, threatened her with a knife, prevented her from

calling the police, prevented her from leaving. It wasn't until a family member intervened and physically removed him did he actually leave.

Again, he could unleash on something like this on any member of the community, not just someone he had a prior relationship—very short relationship with. And based on his level of violence, we do believe that he is, in fact, a very real and present threat.

And I think it is certainly worth noting in terms of willful failure [*sic*] that on the last page of the sworn synopsis we did present and proffer that defendant had apparently been previously deported and had returned. ***.

That it was noted that during this interview that the defendant pointed out that his children live in Honduras and that he made mention to returning to his country that being Honduras.

Given the severity and seriousness of the charges that he is facing, Judge, I think that there is the possibility—I think it is shown, again, with the—that he committed a detainable offense and that there is a high likelihood of willful flight to avoid prosecution. ***

And based on that, for the safety of the community and that of the potential for flight, there is no condition or set of conditions that could mitigate either of those risks and we are asking for him to be detained."

¶ 7    The trial court granted the State's petition, reasoning as follows. Although the State did not establish a risk of willful flight, the State established that the proof was evident or the presumption great that defendant committed aggravated criminal sexual assault (dangerous weapon), aggravated assault in a manner that threatened the life of the victim, aggravated domestic battery (strangulation), aggravated unlawful restraint, and domestic battery. The court also found that the

State established defendant's dangerousness as to M.M. The court relied on the police synopsis, including M.M.'s statements to police at the scene and during her later interview. The court determined that M.M.'s statements were corroborated by the injuries to her face, head, neck, arms, and back, and the redness in her eyes. The court also noted the condition of the residence when police arrived, defendant's threats to kill M.M. while sexually assaulting her, and the repeated strangulations.

¶ 8     In determining that no condition or set of conditions could mitigate the real and present threat defendant posed, the court noted that defendant held M.M. against her will—and abused her—for hours. The court further noted that defendant was driven by jealousy based on suspicion that M.M. was cheating on him. It found that GPS monitoring or electronic home monitoring would not prevent defendant from going to her residence "and having [a] similar *** occurrence here."

¶ 9     Defendant appealed the detention order, and we affirmed. *Salas-Pineda*, 2024 IL App (2d) 240017-U.

¶ 10                    B. Hearing on Defendant's Motion to Reconsider Detention

¶ 11     On February 7, 2024, the trial court held a hearing on defendant's motion to reconsider whether there were less restrictive conditions than detention to address defendant's dangerousness. Defense counsel stated that he had "new evidence" to present.

¶ 12     Defendant called M.M., who testified as follows. She had known defendant for about three months. On the date of the incident, she and defendant drank alcohol together. At one point, he asked to have sexual intercourse with her. M.M. agreed. M.M. testified that, when defendant asked her to have sex, he did not "have a knife in his hand" and did not "give [her] the choice either to have sex with him or die." Defendant did not threaten her in order to have sex with her. No "fears

or threats from [defendant] cause[d] [her]" to have sex, nor did she "fear for [her] life" before having sex. She believed that she "could say no" to having sex. Having sex with defendant on that occasion was "a choice that [she] made." She was not "coerced in any way." When asked if she "consented to that sexual act," M.M. responded, "Yes, absolutely." M.M. would not fear for her safety if defendant were released from custody. She explained:

> "Because he's not like a violent or a confrontational person. It was just an alcohol-fueled fight that just really got out of hand, um, and I personally believe it was just—it had a lot to do with alcohol, but he wasn't normally like that. I think he would be able—if we got in a fight, he would walk away."

¶ 13    On cross-examination, M.M. testified as follows. She and defendant drank together on prior occasions during their relationship. When asked if "things ever escalated before due to alcohol," M.M. recalled an occasion when defendant grabbed her by her face. Regarding the charged incident, M.M. remembered telling Detective Krupp afterward that defendant had broken her cell phone after accusing her of flirting with a bartender. M.M. testified that she and defendant had sex at about 5:30 a.m. on the morning of the incident, after spending about five hours together. She told Krupp that, between 12 a.m. and 5:30 a.m., defendant "had strangled [her] or put his hands around [her] throat approximately 50 times." She also told Krupp that defendant held a knife to her throat and, at one point, she tried to flee her residence but defendant, still holding the knife, tackled her and prevented her from leaving.

¶ 14    M.M. testified that, before they had sex, defendant told her that he wanted to kill her and that she should "thank Jesus and thank his daughter" that he had not killed her. Defendant then showed M.M. his tattoo of Jesus and told her to thank it. M.M. agreed that "[t]hose were not consensual acts" and that she never consented to being strangled.

¶ 15    M.M. further testified that, around 3 a.m. on the morning of the incident, she sent a text message to her brother-in-law, asking for help. Around 5:15 a.m., M.M. observed that her brother-in-law was calling her cell phone. She told Krupp that she ignored the call because she knew her brother-in-law would come if she did not answer. He lived with M.M.'s sister only about 10 minutes away. Her brother-in-law called around the same time that defendant asked her to have sex with him. When defendant asked her to have sex, the knife was no longer in his hand but was on the dresser in the room.

¶ 16    M.M. told Krupp that, while she and defendant were in her bedroom before having sex, his aggression toward her "escalated" and he "started applying significantly more pressure to [her] throat." But M.M. testified that, after that show of aggression and before the sex, the situation "had calmed down for a brief time, and [they] were just sitting on the side of the bed, just kind of talking. [Defendant] was crying, and [M.M.] was comforting him." At the time, the "ordeal" had been "ongoing *** for about five hours," and she was "covered in bruises."

¶ 17    Before having sex with defendant, M.M. asked, " 'Are you going to hurt me?' " and defendant replied, " 'Yes.' " M.M. added:

> "[B]ut after I have been thinking about—because he didn't hurt me in that incident, so it kind of made me think, like, why would he say that? Then I remembered that often, when he didn't understand what I was saying or didn't catch what I said, he would just say, 'Yes.' "

M.M. agreed that there was a "significant" language barrier between her and defendant. M.M. acknowledged that, on prior occasions, she and defendant had consensual sex. On those occasions, "there was no confusion about whether [the sex] was consensual." She told Krupp that she had sex with defendant during the incident in question because it was " '[g]oing to buy [her] time because

- 7 -

they,' being [her] brother-in-law and [her] sister, 'lived like 10 minutes down the road, so [she] just needed to buy a little time for them to get [there].' " Asked if she told Krupp that she did not want to have sex with defendant, she replied, "I think what I meant in that situation is, like, was I in the mood? No, but also like 25 percent of the time I'm not in the mood to have sex." She acknowledged that, before the sex in question, she was beaten for five hours. She told Krupp that the sex "was something—I don't know—just to occupy the time, I guess," while waiting for her brother-in-law to arrive. She explained:

> "I do think that there were other things I could have done, too, in that time. I think I could have manipulated the situation, too, like took advantage that he was in a vulnerable state and crying, and I felt like, yeah, having sex with him would comfort him more."

¶ 18    M.M. was asked whether she told law enforcement that she felt " 'forced' " to have sex with defendant " 'because of the threats he made to [her]' " and that she " 'felt like it was just something [she] had to do in order to survive.' " She replied, "Maybe, yes."

¶ 19    M.M. identified several exhibits showing the knife that defendant held to her throat, the injuries he inflicted, and the text message that she sent to her brother-in-law at 3 a.m. asking for help.

¶ 20    On redirect examination, M.M. was asked:

> "Q. As of today's date, you're saying this act of sexual intercourse was consensual?
>
> A. Yeah.
>
> Q. And before it happened, [defendant] didn't threaten you verbally in order to have this sexual intercourse?
>
> A. No.

Q. And he didn't threaten you physically with a knife or any other manner with a weapon—

A. No.

Q. —to have you—to have this intercourse?

A. No. He didn't have it in his hand, and we had sex in a whole other room, so the knife wasn't even in play."

¶ 21    The trial court denied defendant's motion to reconsider. The court considered the sworn synopsis, the exhibits, and M.M.'s testimony that the sexual intercourse underlying the charge of aggravated criminal sexual assault (dangerous weapon) was consensual. The court also considered the numerous domestic battery charges. The court noted as well M.M.'s acknowledgement—both in her testimony and the statements attributed to her in the police synopsis—that defendant confined her to her residence for a period of hours, during which time he held a knife to her throat and caused injuries "all over [her] body." The court commented that "a significant amount of violence *** was ongoing for a period of time." Although M.M. testified that she had no reason to fear defendant if he were released, the court disagreed, expressing concern for M.M.'s safety and well-being if defendant were not detained. Because there were no less restrictive conditions available to address these safety concerns, the court ordered defendant's continued detention.

¶ 22    Defendant appealed the trial court's ruling denying his pretrial release, and this court affirmed. *Salas-Pineda*, 2024 IL App (2d) 240124.

¶ 23                                    C. Jury Trial

¶ 24    On April 18, 2024, the public defender was discharged. Private counsel appeared for defendant and represented him for the remaining proceedings below.

¶ 25    A jury trial commenced on December 2, 2024. Jack Settepani, M.M.'s brother-in-law, testified first as follows. Settepani received a text message from M.M. at 3 a.m. on December 30, 2023, that read, "Help." After Settepani woke up, he replied to M.M.'s text at 5:55 a.m., asking what was happening. After not receiving a response, Settepani and his wife, M.M.'s sister, decided to drive to M.M.'s residence at 6 a.m.; M.M. lived about eight minutes away. When Settepani and his wife entered M.M.'s house and called out her name, M.M. came running from the back hall saying, " 'Jack, help, he's trying to kill me.' " She was frightened, and her voice was "elevated, panicked." M.M. was wearing only pants and was covering her chest with her arms. Settepani saw defendant, who was naked, walk out of the back bedroom. Settepani knew that defendant was M.M.'s boyfriend at the time; they had "broken up and were back together again." Settepani stepped between defendant and M.M. and pushed defendant backward. Defendant fell to the ground, and Settepani told him to take his stuff and "get out." Defendant repeatedly said, "Listen, listen, let me explain." Eventually, defendant got dressed, went outside, and drove his vehicle into the yard of another residence.

¶ 26    Officer Patricia Miller testified next as follows. Around 6:30 a.m. on December 30, 2023, she was dispatched to M.M.'s residence. Miller saw defendant lying on the grass near a vehicle; he had injuries to his hand and face and was missing a tooth. Defendant told Miller that he had been drinking alcohol with M.M. at her residence when a man entered, kicked him in the face, and told him leave. Defendant was ultimately taken into custody. Miller then returned to the scene and took photographs of M.M. M.M. seemed upset and had injuries on the exposed parts of her body. In particular, Miller saw scratches on M.M.'s neck and bruises on her arms. Photographs of M.M.'s injuries were admitted into evidence without objection.

¶ 27 Deputy Justin Douglas testified as follows. He was dispatched to M.M.'s residence based on a domestic violence report. M.M. was upset and had bruises and cuts on her face, neck, back, and arms. Douglas took statements from M.M., her sister, and Settepani. Douglas also took photographs inside M.M.'s residence. Douglas identified a photograph of M.M.'s basement bedroom showing a knife on top of a dresser. Other photographs showed a bottle of Jack Daniels whiskey in the living room and bottles of Tito's Vodka and lemonade in an upstairs guest bedroom.

¶ 28 Douglas further testified that M.M. came to the sheriff's office and spoke with Detective Krupp on December 31, 2023. Douglas photographed M.M.'s injuries. He explained that it was common practice to delay photographing an injured victim because bruises "develop[ ] over time." M.M.'s injuries were documented in more than 20 photographs.

¶ 29 Registered nurse Makenna Jensen testified next as follows. She worked at Advocate Sherman Hospital and was certified as an expert in sexual assault examinations and sexual assault collection kit completion. When Jensen first met with M.M., she was "pretty flat, tearful, a little distraught about the situation she was experiencing." M.M. reported that she "was choked, *** thrown down the stairs, *** had a knife held to her neck and was told that she needed to stop screaming otherwise he would kill her. She was punched and kicked in the face, she was continually choked on and off throughout the encounter." Jensen's examination revealed bruising throughout M.M.'s body, including her face, neck, chest, back, arms, and legs. M.M. also exhibited some redness and stated she was tender and sore. Jensen took swabs and a DNA sample from M.M. Although Jensen did not observe any injuries to the inside of M.M.'s vagina, Jensen noted that it was not unusual for her to see no internal vaginal injuries during a sexual assault examination.

¶ 30 Next, the parties stipulated, among other things, that Katherine Sullivan, a forensic biologist with the Illinois State Police, was qualified as an expert in the field of forensic DNA

analysis. Sullivan analyzed DNA from a sample taken from M.M.'s vaginal swab and would testify that she identified a mixture of two DNA profiles. One profile belonged to M.M., and the other DNA profile was compared to a buccal standard taken from defendant. The latter profile was 390 times more likely to have originated from M.M. and defendant than M.M. and an unknown, unrelated person. Further, a sperm cell fraction from M.M.'s vaginal swab yielded one DNA profile, which was compared to an oral swab taken from defendant. That profile was 2.8 octillion times more likely to have originated from defendant than an unknown, unrelated individual.

¶ 31   M.M. testified next as follows. M.M. was 34 years old on December 30, 2024, and lived in a single-family residence in Algonquin. At the time of trial, M.M. had been dating defendant for about 2½ months. Defendant spoke Spanish. His English was "limited," but he and M.M. were able to communicate in person and via phone or text.

¶ 32   On December 29, 2024, M.M. and defendant went out to dinner and then to a local bar before returning to M.M.'s residence around 12:30 a.m. They both drank alcohol that night. Specifically, M.M. was drinking Jack Daniels and "diet," and defendant was drinking vodka and lemonade. After about an hour of playing music and drinking alcohol, M.M. and defendant got into an argument over M.M.'s Facebook profile not displaying her relationship status. Defendant was also upset because he thought M.M. was lying about some plans she had made with a girlfriend. Defendant accused M.M. of "talking to other guys." After about 30 minutes of arguing, there was a "physical altercation." It began when defendant pushed M.M. down onto a couch in the living room. While she was on the couch, defendant yelled at her, called her a liar, and grabbed her by the neck with one hand, "jaw bone to jaw bone." At this time, defendant did not apply pressure to her throat, and M.M. had no trouble breathing. However, she felt "a little bit" of pain and was frightened. M.M. and defendant then moved from the couch to the kitchen table. They

were sitting across from each other when defendant hit her in the face with an open hand and grabbed her neck. This "hurt" M.M., but defendant still did not apply pressure to her neck. Defendant continued to yell at M.M., call her a liar, and demand she tell him the truth. "It was back-and-forth for a couple hours."

¶ 33 M.M. testified that defendant had taken her cell phone but given it back at some point when he went to the bathroom. M.M. then sent a text message to Settepani because she knew he would come to her residence if she texted him. M.M. deleted the text message to prevent defendant from seeing it, because she was afraid he would get angry.

¶ 34 At some point, defendant wanted to go to the basement, but M.M. did not want to. This was because M.M. had a gun in the nightstand of her basement bedroom and she was afraid of defendant. Defendant pushed and pulled M.M. toward the basement, and then he pushed her down the stairs. M.M. fell headfirst halfway down the stairs. Defendant was on top of her. The two "were kind of like wrestling going down or getting up" until M.M. reached the top of the stairs.

¶ 35 M.M. then asked defendant if they could go to sleep in the guest bedroom. They went to the guest bedroom, and M.M. sat down on the bed. Defendant stood next to the dresser and told her to lie down and go to sleep. However, M.M. could not sleep because she was "[f]eeling adrenaline." Defendant then got angry, got on top of her, and grabbed her throat again. He yelled that she was a liar. This time, defendant applied enough pressure that M.M. struggled to breathe. She began "wriggling" to catch her breath, shoving her knees between her and defendant. He yelled that M.M. was a liar and told her to thank "Jesus and his daughters" that he was not going to kill her. M.M. complied by thanking defendant, and they continued to "struggle[ ] back-and-forth." M.M. elaborated:

"He would get on top of me and grab me by my neck, things would kind of calm down. We would go to the kitchen, make him another drink, I would get water, use the bathroom and go back to fighting again."

M.M. had difficulty breathing when defendant grabbed her neck. She noted that defendant would not leave her alone, even when she went to the bathroom.

¶ 36    At one point, M.M. was in the kitchen, making defendant a drink, when he grabbed a knife from the knife block. M.M. turned and ran into the garage and out through the utility door. M.M. was yelling for help when defendant pulled her back into the garage and pushed her to the ground. Defendant held the knife to her neck and told her to "shut up, or don't move." Defendant then led M.M. back into the house. He held the knife to her abdomen and told her to go back to the guest bedroom. The tip of the knife touched M.M.'s side, and it "hurt."

¶ 37    When they returned to the guest bedroom, M.M. got on the bed. Defendant got back on top of her, grabbed her neck, and told her not to move. M.M. could not breathe. Defendant pointed the knife at her throat and kept calling her a liar. M.M. tried to pull away, and defendant hit her "a couple times" on the side of her head or face with his open hand. She tried to block his blows. He hit her in the eye with the butt of the knife, and this also hurt.

¶ 38    As before, defendant would intermittently let M.M. go, such as when he used the bathroom or allowed her to drink water. Defendant "seemed to get angrier throughout the night." At one point, defendant pushed M.M. down on the floor and against a nightstand. He got on top of her and choked her until she could not breathe. After that, defendant stood up, still holding the knife, and kicked M.M. in the head and body five or six times. When she raised her hands to protect herself, he yelled at her to put her arms down. When asked if defendant "strangled" her more than

30 times "to the point where [she] couldn't breathe," M.M. replied, "Yeah. Honestly, it was a lot of times."

¶ 39    Finally, defendant started to "calm down." Defendant placed the knife on the dresser, which was about three feet from the bed, and sat down on the bed. Defendant's demeanor changed rather suddenly, and he started to "cry[ ] about things that had happened in his life." Defendant told M.M. that he hated her and his mother. M.M. sat next to defendant and comforted him because she cared for him and did not want him to be angry anymore. M.M. then saw her phone, which was on the nightstand, light up. M.M. ignored the phone because it was probably her sister or brother-in-law, and M.M. knew they would come if she did not answer. They lived less than 10 minutes from M.M.'s residence.

¶ 40    Defendant then asked M.M. "if [she] wanted to have sex." M.M. asked defendant, "Are you going to hurt me?" Defendant replied, "Yes." Defendant and M.M. proceeded to have oral and vaginal sex. When M.M. started to perform oral sex, her mouth was dry, so she suggested they get on the bed. M.M. then took off her clothes and got on top of defendant. They started to have sexual intercourse on the bed, but because the bed was "old" and "terrible," they moved to the living room. M.M. also wanted to get away from her phone so that defendant would not "see the calls and texts." They had vaginal sex on the couch for about 15 minutes, and defendant ejaculated inside her without a condom. Defendant did not hurt her during this act of sexual intercourse.

¶ 41    M.M. and defendant then went back to the guest bedroom. On the way, M.M. saw car lights in front of the house. Defendant closed the door to the guest bedroom, and M.M. started putting her clothes back on. M.M. then heard her sister in the living room, so she opened the bedroom door and ran from defendant. Defendant followed M.M. M.M. saw her sister and Settepani, and an altercation ensued between defendant and Settepani. At this point, M.M. turned around and ran

back to the guest bedroom, where she grabbed the knife and her phone. M.M. grabbed the knife "[s]o it couldn't be used to hurt [her] sister or [her] brother-in-law." M.M. then ran to the basement and called 911.

¶ 42    The 911 call was played for the jury. During the call, M.M. identified herself and reported that defendant (her "boyfriend") had physically assaulted her and threatened her life. M.M. stated that defendant had held a knife to her neck, kicked her multiple times in the head and face, and choked her until she could not breathe. M.M. also reported that defendant had been holding her against her will for hours, not allowing her to leave, and that he had been drinking. M.M. said she had a couple of drinks earlier but had not been drinking recently. M.M. told the dispatcher that her sister and brother-in-law had just arrived and that her brother-in-law had knocked defendant to the ground. Defendant was still inside M.M.'s residence, arguing with them. M.M. said she had thought she was going to die that night and that defendant had placed a knife to her neck while repeatedly telling her he was going to kill her. M.M. also said, "He, he made me, well he, he wanted to have sex and I just agreed to it to calm him down." M.M. requested an ambulance because she had been kicked in the head several times. The 911 call ended as police and emergency medical services arrived.

¶ 43    M.M. resumed testifying. She said that she went to the hospital with her sister and completed a sexual assault kit.

¶ 44    M.M. further testified that, two or three weeks prior to the incident, defendant "smashed" her cell phone onto her driveway because he thought she had been talking to "some guy." Afterward, they went inside her residence to sleep, but defendant got mad and grabbed her face, which hurt and left a bruise inside her mouth. M.M. did not report this incident to the police. M.M. wanted to "move past it" and hoped things would get better.

¶ 45    When asked why she said "yes" to having sex with defendant, M.M. said, "I think I just wanted to keep him occupied, keep things calm," "[u]ntil somebody could arrive." Eventually, her sister and brother-in-law did arrive.

¶ 46    Later in her testimony, M.M. identified photographs of her residence and her injuries.

¶ 47    On cross-examination, M.M. testified as follows. M.M. acknowledged that, when defendant asked her to have sex, he was "asking [her] for [her] permission." M.M. "agreed" to have sex with defendant. When asked if she believed she had consented, M.M. replied, "I do believe it was consensual, yes." She reiterated that she believed "today," *i.e.*, while testifying, that the sex was consensual and that she had "led [defendant] to believe" at the time that the sex was consensual. M.M. did not believe she gave defendant any reason to believe that the sex was not consensual. Defendant never "brandish[ed] or put his hands on the knife" during the sexual intercourse.

¶ 48    The State introduced recordings of two jail phone calls defendant made to M.M. The recordings were played for the jury. In the first call, made January 1, 2024, defendant said he did not remember what had happened during the incident. M.M. recounted her injuries inflicted by defendant and said that defendant had threatened to kill her and had a knife to her throat. In the second call, a few minutes later, defendant said he was "sorry for everything." M.M. told defendant that she no longer felt safe because he had said during the incident that she was going to die. She reminded defendant that he had choked and beaten her for five hours, leaving her body covered in bruises as well as marks from a knife he held to her neck.

¶ 49    After the State rested, defendant moved for a directed verdict. In particular, defense counsel argued that the aggravated criminal sexual assault (dangerous weapon) charge should be dismissed because M.M. testified that the sexual encounter was consensual and that the knife was still in the

bedroom when they had sex on the couch. M.M. was not "substantively" impeached on either point, counsel claimed.

¶ 50   The State countered, *inter alia*, that it was not required to prove that defendant was holding the knife at the time of sexual penetration.

¶ 51   In response, defense counsel argued that M.M.'s testimony showed that the sexual intercourse was consensual in that the sex occurred after defendant started crying and "everything had stopped." In addition, counsel argued that, while the State did not need to prove that defendant held the knife during the sexual act, the State did have to prove that there was "some threatening gesture or some threatening verbiage in that regard, and that was not done here."

¶ 52   The trial court denied the motion for a directed verdict. The defense presented no evidence.

¶ 53   During closing arguments, the State argued that the knife was a consistent threat to M.M., even during the sexual act, as it had been used against her "all night" and was only a "a reach away from the defendant" when he asked for sex and said he would hurt M.M. The sex was not consensual, because M.M. "submit[ted]" only to "buy[ ] herself time" to be "saved from her situation."

¶ 54   In response, defense counsel conceded that the State proved domestic battery and unlawful restraint but reaffirmed that the State failed to prove aggravated criminal sexual assault (dangerous weapon), given M.M.'s testimony that the sex was consensual.

¶ 55   In rebuttal, the State also relied on the 911 call in which M.M. told the dispatcher that she agreed to have sex in order to calm defendant down.

¶ 56   The jury found defendant guilty of all 10 counts that went to trial.

¶ 57   Defendant subsequently filed a motion for a new trial, which the trial court denied. Following a sentencing hearing on February 4, 2025, the trial court merged some counts and

sentenced defendant to prison terms of 16 years for aggravated criminal sexual assault (dangerous weapon), 5 years for aggravated domestic battery (strangulation), and 2 years for aggravated unlawful restraint. On the domestic battery conviction, he was sentenced to time served. The 5-year and 2-year terms were concurrent to each other but consecutive to the 16-year term.

¶ 58    Defendant timely appealed.

¶ 59                                        II. ANALYSIS

¶ 60    Defendant argues that his trial counsel denied him the effective assistance of counsel by failing to elicit from M.M. exculpatory testimony similar to what she gave during the hearing on defendant's motion to reconsider his pretrial detention. Defendant asserts that this testimony would have supported his consent defense and created a reasonable probability of acquittal on the charge of aggravated criminal sexual assault (dangerous weapon).

¶ 61    Ineffective assistance of counsel claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687; *People v. Petrenko*, 237 Ill. 2d 490, 496-97 (2010). "More specifically, the defendant must demonstrate that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Petrenko*, 237 Ill. 2d at 496-97 (quoting *Strickland*, 466 U.S. at 694).

¶ 62    As for *Strickland*'s performance prong, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional

judgment." *Strickland*, 466 U.S. at 690. "Matters of trial strategy are generally immune from ineffective assistance of counsel claims." *People v. Jones*, 2023 IL 127810, ¶ 51.

> "Generally, the decision whether or not to cross-examine or impeach a witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel. [Citation.] The manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court. [A] [d]efendant can only prevail on an ineffectiveness claim by showing that counsel's approach to cross-examination was objectively unreasonable." *People v. Pecoraro*, 175 Ill. 2d 294, 326-27 (1997).

¶ 63 "[A] mistake in trial strategy or an error in judgment by defense counsel will not alone render representation constitutionally defective." *People v. Peterson*, 2017 IL 120331, ¶ 80. "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." (Internal quotation marks omitted.) *Id.*

¶ 64 "The prejudice prong [of *Strickland*] requires a showing of actual prejudice, not simply speculation that the defendant might have been prejudiced." *People v. Bustos*, 2020 IL App (2d) 170497, ¶ 87. A reasonable probability means a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair. *Id.* When a claim of ineffective assistance of counsel is raised for the first time on appeal, our review is *de novo*. *Id.*

¶ 65 Defendant appeals only his conviction of aggravated criminal sexual assault (dangerous weapon) under section 11-1.30(a)(1) of the Criminal Code of 2012 (720 ILCS 5/11-1.30(a)(1) (West 2022)). "To prove aggravated criminal sexual assault, the State must prove that [the] defendant committed criminal sexual assault and an aggravating factor is present." *People v.*

*Gomez*, 2011 IL App (1st) 092185, ¶ 67. As charged here, aggravated criminal sexual assault (dangerous weapon) required proof that defendant committed an act of sexual penetration and "use[d] force or threat of force." 720 ILCS 5/11-1.20(a)(1) (West 2022).

" 'Force or threat of force' means the use of force or violence or the threat of force or violence, including, but not limited to, the following situations:

(1) when the accused threatens to use force or violence on the victim \*\*\*, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat; or

(2) when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." *Id.* § 11-0.1.

¶ 66 The charged aggravating factor was that defendant "display[ed], threaten[ed] to use, or use[d] a dangerous weapon, other than a firearm," *i.e.*, a knife. *Id.* § 11-1.30(a)(1).

¶ 67 Defendant's challenge focuses on the affirmative defense of consent. Consent is a valid defense to the crime of aggravated criminal sexual assault. *People v. Kline*, 2024 IL App (1st) 221595, ¶ 61; see also *People v. Everette*, 141 Ill. 2d 147, 156 (1990) ("[i]t has long been the position of this court that a defendant is entitled to instructions on those defenses which the evidence supports," even where the evidence is "slight" (internal quotation marks omitted)). " 'Consent' means a freely given agreement to the act of sexual penetration or sexual conduct in question. Lack of verbal or physical resistance or submission by the victim resulting from the use of force or threat of force by the accused shall not constitute consent." 720 ILCS 5/11-0.1 (West 2022). "Physical resistance or demonstrative protestations are not necessary to demonstrate that a victim was forced to have sexual intercourse, and the absence thereof does not establish consent if the victim was threatened or in fear of being harmed." *People v. Mpulamasaka*, 2016 IL App (2d)

130703, ¶ 74. "In sexual assault cases, force and consent are two sides of the same coin, and by proving the use of force, the State necessarily proves lack of consent." *Kline*, 2024 IL App (1st) 221595, ¶ 61; see also *People v. Roberts*, 182 Ill. App. 3d 313, 317 (1989) ("Consent is the very antithesis of force."). When a defendant raises consent as an affirmative defense, the State must prove lack of consent beyond a reasonable doubt. *Kline*, 2024 IL App (1st) 221595, ¶ 61.

¶ 68    On appeal, defendant recognizes that trial counsel pursued a consent defense based on M.M.'s testimony that she "agreed" to have sexual intercourse with defendant. However, defendant claims that counsel "inexplicably failed to elicit available testimony from M.M. that would have explained problematic facts, mitigated damaging inferences, and supported a finding of consent." According to defendant, counsel faced a "significant hurdle" on the issue of whether M.M.'s consent was "freely given." Defendant points specifically to (1) the evidence of violence preceding the sexual activity and (2) M.M.'s testimony that she had asked defendant, just prior to sexual intercourse, whether he planned to hurt her, to which defendant replied, "Yes." Defendant argues that, "[f]aced with this damaging testimony," an objectively reasonable advocate would have elicited "favorable contextual information," such as what M.M. provided in her testimony at the hearing on defendant's motion to reconsider his pretrial detention. There, M.M. testified that (in defendant's words) "[defendant] routinely responded with 'yes' when he did not understand the question, and that she was not afraid of the knife, did not feel threatened, and believed she could have refused to have sex." Defendant argues that this testimony would have provided "critical context [at trial] for evaluating" whether M.M.'s agreement to the sexual act was freely given.

¶ 69    Defendant clarifies that his claim is *not* that trial counsel should have sought to introduce M.M.'s pretrial testimony, either as substantive or impeachment evidence. He argues, rather, that counsel should have made the appropriate queries to elicit testimony similar to what M.M. gave at

the pretrial hearing. According to defendant, "it is presumed that [M.M.] would have testified similarly at trial." "Moreover," defendant contends,

> "this testimony would not have required impeaching[ ] M.M. since she already testified [at trial] [that] the sex was consensual and that she did not give [defendant] any reason to believe it was not consensual. This additional information would have only strengthened the consent defense, not contradicted it. Counsel could have directly asked questions clarifying the 'Yes' response, the absence of any fear with respect to the knife, and the freely given consensual nature of the act, ***."

¶ 70 Acknowledging that trial counsel entered his appearance after the pretrial detention hearings, defendant asserts that counsel was nonetheless responsible for reviewing the prior proceedings. In defendant's view, no reasonable trial strategy supported trial counsel's failure to elicit similarly favorable testimony from M.M. Finally, defendant argues that counsel's failure prejudiced him and undermined confidence in the trial's outcome, in that the evidence regarding M.M.'s consent to the sexual act was "at least closely balanced."

¶ 71 The State makes several points in response. First, the State partly disputes the accuracy of defendant's account of M.M.'s testimony at the pretrial hearing. Specifically, the State disputes that, as defendant claims, M.M. testified that she was not afraid of the knife. Second, as to the rest of the testimony defendant attributes to M.M. at the pretrial hearing, the State argues that trial counsel was barred from eliciting those statements, because they constituted inadmissible prior consistent statements. See *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 52 (the general rule is that prior consistent statements of a witness are inadmissible for the purpose of corroborating the witness's trial testimony, because they serve to unfairly enhance the credibility of the witness). Third, the State argues that, even if M.M.'s pretrial statements were admissible, trial counsel's

decision not to open the door to potentially damaging redirect examination was a matter of sound trial strategy. Finally, and in the alternative, the State claims that even if trial counsel's performance was deficient in the manner defendant claims, defendant cannot prove that he was prejudiced, given the "overwhelming amount of other evidence admitted at trial that M.M. did not consent to having sex with defendant."

¶ 72    We question the State's invocation of the bar against use of prior consistent statements, because, again, defendant does not claim that trial counsel should have attempted to introduce M.M.'s prior testimony but only that counsel should have attempted to elicit similar testimony at trial. Defendant confirms in his reply brief that he is not arguing that trial counsel should have sought "formal admission of the pretrial testimony."

¶ 73    But, for other reasons, the State is correct that defendant's ineffectiveness claim fails. At the outset, we question a key premise of defendant's claim: that we can presume that M.M. would have given trial testimony similar to her pretrial testimony on the specific points defendant identifies. As authority for that presumption, defendant cites *People v. Hemphill*, 2021 IL App (2d) 190473-U. In *Hemphill*, however, we held that the witness could be presumed to give the same answer if the prosecutor had *immediately* rephrased the question. *Id.* ¶ 134. Here, the trial occurred 10 months after the pretrial hearing. We assume, without necessarily accepting, that the presumption recognized in *Hemphill* applies here despite that 10-month interval.

¶ 74    Moving to defendant's specific contentions, we consider first defendant's claim that trial counsel was ineffective for failing to query M.M. so that she would testify, as she did at the pretrial hearing, that she "was not afraid of the knife, did not feel threatened, and believed she could have refused to have sex." On direct examination at the pretrial hearing, trial counsel asked M.M. a series of questions about the circumstances of the sexual intercourse she had with defendant during

the incident. She testified that, when defendant asked to have sex with her, she agreed. At that time, he was not holding a knife in his hand. He did not threaten her in order to have sex; no "fears or threats from [defendant] cause[d] [her]" to have sex. She believed that she "could say no" to having sex. Having sex with defendant on that occasion was "a choice that [she] made." She was not "coerced in any way." When asked if she "consented to that sexual act," M.M. responded, "Yes, absolutely." M.M. said she would not fear for her safety if defendant were released. On cross-examination, she admitted telling Krupp that, between 12 a.m. and 5:30 a.m., defendant physically assaulted her and held a knife to her throat. Eventually, defendant calmed down, began to cry, and asked her to have sex. At that time, they were in the guest bedroom, and the knife was on the dresser. On redirect examination, she testified that defendant, before the sex, did not verbally threaten her or threaten her with the knife. She added that, while they had sex, the knife was in another room, "so [it] wasn't even in play." The State is correct that M.M. was not specifically asked if she feared the knife. However, it is fairly inferable from the preceding testimony that she did not fear the knife, at least during the sexual act.

¶ 75    We agree with the State that trial counsel's performance was not unreasonable. As the State points out, trial counsel substantially cross-examined M.M. at trial and elicited testimony similar to what she gave at the pretrial detention hearing. On cross-examination, M.M. acknowledged that, when defendant asked her to have sex, he was "asking [her] for [her] permission." M.M. "agreed" to have sex with defendant. When asked if she believed she had consented, M.M. replied, "I do believe it was consensual, yes." She reiterated that she believed "today," while testifying, that the sex was consensual and that she had "led [defendant] to believe" at the time that the sex was consensual. M.M. did not think she gave defendant any reason to believe that the sex was not consensual. Defendant never "brandish[ed] or put his hands on the knife" during the sexual

intercourse. When they moved to the living room couch to have sex, defendant left the knife in the guest bedroom.

¶ 76　Thus, trial counsel had succeeded in eliciting favorable testimony on the issue of consent. Counsel could have continued asking the same essential questions in different ways, hoping that M.M. would answer more closely to how she testified at the pretrial hearing. However, it is sound trial strategy not to present cumulative evidence. See *People v. McFadden*, 2021 IL App (5th) 170139-U, ¶ 83. Also, as the State points out, such persistence might have run the risk that the prosecutor would respond on redirect examination by questioning M.M. on some of the same points she addressed at the pretrial hearing and thereby elicit similar testimony that would undermine the consent defense. For example, at the pretrial hearing, M.M. acknowledged telling law enforcement that, between 12 a.m. and 5:30 a.m., defendant "had strangled [her] or put his hands around [her] throat approximately 50 times." M.M. was also asked whether she told law enforcement that she felt " 'forced' " to have sex with defendant " 'because of the threats he made to [her]' " and that she " 'felt like it was just something [she] had to do in order to survive.' " She replied, "Maybe, yes." Based on all of these considerations, we conclude that reasonably competent counsel could have decided not to belabor the issues of whether M.M. feared the knife, felt threatened, and believed she could have refused sex.

¶ 77　Defendant also argues that trial counsel was ineffective for failing to elicit testimony similar to M.M.'s pretrial testimony about the language barrier between her and defendant. M.M. testified at the pretrial hearing (and also at trial) that, before she had sex with defendant, she asked him, " 'Are you going to hurt me?' " and he replied, " 'Yes.' " According to defendant, trial counsel was ineffective for failing to elicit M.M.'s explanation for defendant's answer: "because he didn't hurt me in that incident, *** it kind of made me think, *** why would he say that? Then I

remembered that often, when he didn't understand what I was saying or didn't catch what I said, he would just say, 'Yes.' "

¶ 78   Here, too, trial counsel's action is explicable as sound trial strategy. M.M. testified at trial that defendant's English was "limited," but he and M.M. were able to communicate in person and via phone or text. Indeed, M.M. testified that she feared that defendant would see an incoming text message from her brother-in-law. Given this testimony, trial counsel could have been concerned that M.M. would lose credibility if she suggested that defendant did not understand her relatively simple query.

¶ 79   We hold that trial counsel's failure to elicit the foregoing testimony from M.M. was supported by sound legal strategy and, at worst, did not amount to a failure to meaningfully test the State's case. Consequently, we cannot find deficient performance under *Strickland*. See *Peterson*, 2017 IL 120331, ¶ 80.

¶ 80   But even if we were to agree that trial counsel's performance was deficient under *Strickland*, we could not agree that the deficiency prejudiced defendant under *Strickland*. The State's evidence of lack of consent was so overwhelming that any additional queries trial counsel made of M.M. on that issue would have had no reasonable probability of success. See *People v. Patterson*, 2014 IL 115102, ¶ 87 (where evidence of the defendant's guilt is overwhelming even apart from defense counsel's act or omission, the defendant cannot show a reasonable probability that, but for counsel's error, the result of the proceeding would have been different).

¶ 81   M.M.'s account—provided through her trial testimony and her statements to the nurse who performed her sexual assault examination—was that, over the course of more than five hours, defendant poured two drinks on M.M., took her phone, pushed her down and got on top of her, strangled her over 30 times until she could not breathe, pushed her down a flight of stairs, held a

knife to her throat, prevented her from leaving by holding the tip of the knife to her side, hit her in the face with an open hand and with the butt of the knife, kicked her in the face and body five or six times while yelling at her not to protect herself with her arms, and threatened to kill her. In addition, M.M. testified that she was scared of defendant, that his anger escalated over the course of the incident, and that his physical assaults hurt her. M.M.'s injuries in the aftermath of the incident supported her account.

¶ 82    Other evidence supported M.M.'s version of events, such as her text to her brother-in-law that requested help, as well as her brother-in-law's testimony that, when he and M.M.'s sister arrived at the residence, M.M. ran down the back hall, partially clothed, yelling, " 'help, he's trying to kill me.' " M.M.'s appearance, state of mind, and outburst were consistent with her testimony that she had sex with defendant in order to buy time for her brother-in-law and sister to arrive and aid her. Likewise, M.M. told the 911 dispatcher that defendant held her against her will for hours, held a knife to her neck, kicked her in the face and head, and threatened her life. M.M. told the 911 dispatcher, "He, he made me, well he, he wanted to have sex and I just agreed to it to calm him down." M.M. explained to the 911 dispatcher that she thought she was going to die that night.

¶ 83    Thus, although M.M. testified that defendant had calmed down and cried before asking for sex and that she believed she consented to the act, there was compelling evidence that M.M. *did not* consent but submitted under the reasonable belief that she faced a continuing threat of force, having endured more than five hours of defendant's physical abuse and verbal threats. See *People v. Smith*, 2019 IL App (1st) 161246, ¶¶ 29, 31 ("The use or threat of force *** does not occur solely at the precise time of sexual penetration. To be sure, the use or threat of force may continue *during* the sexual penetration—it usually does—but that is not when the use or threat of force *begins*." "A threat of force precedes the sexual penetration by some amount of time; it lingers over the victim,

who is subdued precisely because the victim has a reasonable belief that the accused 'has the ability to execute that threat' of force." (Emphases in original.) (quoting 720 ILCS 5/11-0.1 (West 2014))). It was the jury's province to credit M.M.'s account to the 911 dispatcher—where she claimed that she agreed to the sex "just *** to calm [defendant] down"—rather than her trial testimony nearly a year afterward. See *People v. Appelt*, 2013 IL App (4th) 120394, ¶ 66 ("[V]ictims of domestic violence can be very forgiving. After their bruises heal and some time passes, they commonly change their mind about testifying against the loved one who beat them up.").

¶ 84    Accordingly, defendant has failed to show that trial counsel's representation was deficient or, alternatively, that any deficiency prejudiced him.

¶ 85                                    III. CONCLUSION

¶ 86    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 87    Affirmed.

*People v. Salas-Pineda*, 2026 IL App (2d) 250061

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 24-CF-10; the Hon. Julia A. Yetter, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Lucas Walker, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Lynn M. Harrington, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |